165 586
170 283
165 586
178 60

165 586
207 530

165 586
e205 126

165 586
223 206

# Robert Taylor, Executor of John Trich, Appellant, v. J. W. Trich et al.

[Marked to be reported.]

*Will—Testamentary capacity—Delusions—Evidence.*

A delusion is a creation purely of imagination such as no sane man could believe, a belief in the existence of something that does not exist. The proof of the existence and influence of delusions in any particular case may be found in the surrender of the will to imaginary directions regarded by the victim as the directions of God, or of spirits, speaking to him from another world, or to the control of an impulse due to an imaginary state of facts.

Partial insanity is a derangement of one or more faculties of the mind which prevents freedom of action. The question in any given case is whether the act under investigation was done upon consideration of existing facts, or under the influence of a delusion that controlled the will of the doer and destroyed his freedom of action.

Where it is claimed that the testator was subject to delusions but was otherwise sane, it is not improper for the court to say to the jury that they were not to decide upon the soundness of the peculiar views entertained by him " but simply whether or not they so impressed his mind, became as it were incorporated into his mental constitution, as to control his judgment in regard to the use and disposition of his property, so as to prevent his perceiving or appreciating the ordinary duty he owes to his family or their claims upon him as a father in that respect."

In such a case it is improper to ask a witness whether the testator was competent to make a will and dispose of his property, or whether the testator was sane or insane. Both questions overlook the distinction between general insanity and the existence of an insane delusion.

Argued Nov. 5, 1894. Appeal, No. 134, Oct. T., 1894, by plaintiff, from judgment of C. P. No. 1, Allegheny Co., Sept. T., 1893, No. 83, on verdict for defendants. Before STERRETT, C. J., WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Reversed.

Issue devisavit vel non to determine validity of will of John Trich, deceased.   Before STOWE, P. J.

At the trial it appeared that testator, who was a resident of McKeesport, died April 26, 1893, at the age of seventy-five years.   On Feb. 7, 1882, he consulted his counsel as to drawing a will, and, after consultation, the will was executed by testator and witnessed by his counsel and Samuel Fields.   After testator's death the will was presented for probate by the executor, Robert Taylor, and a caveat was filed by four of his children.   He left surviving him a widow, his third wife, and six children, and also children of two deceased sons.   The register certified the case to the common pleas and an issue was made up as to (1) undue influence, and (2) testamentary capacity.   Upon the trial there was no testimony of undue influence.   The amount of testator's estate was estimated to be about $50,000.   After providing for his wife and the payment of his debts, he directed that his residuary estate should be sold, converted into money, and divided between two charities.

The testimony relating to testator's testamentary capacity is stated in the opinion of the Supreme Court.

When H. B. Blackstone, a witness for defendant, was on the stand, he was asked: " Q. I will put this question, whether or not from your knowledge of testator's mental condition in February, 1882, his religious ideas of the character detailed by you would or would not control his mind in the disposition of his property?"   Objected to as immaterial, irrelevant and incompetent.   Objection overruled and bill sealed.   " A. His religious ideas would control his mind in regard to making his will." [10]

When Thomas Tilbrook, a witness for defendant, was on the stand, he was asked : " Q. Now please state from your own knowledge of Mr. John Trich, whether or not, in February, 1882, he was competent to make a will and dispose of his property. Objected to.   By the Court: Should not the question be, whether he was sane or insane?   By Mr. Brown : This is held as perfectly proper in a Pennsylvania case in which the Supreme Court reversed the court below.   Objection overruled and bill sealed.   Q. State whether he was fit or unfit to make a will from your knowledge of his mental condition in February, 1882. Objected to as incompetent, immaterial and irrelevant.   By the

Court: If it were not for the statement that the Supreme Court had so decided I would not admit it. It is too broad. It involves the general idea as to whether any one man thinks anybody else is fit to make a will. Objection overruled and bill sealed. A. He was wholly unfit to make a will." [11]

When Dr. Wm. Codville, a witness for defendant, was on the stand, he was asked: " Q. Doctor, you have already testified at length, but I want to ask you, from your knowledge of John Trich prior to and down to February 8, 1882, and from the facts detailed in your testimony, whether or not you think he was fit and competent to make a will in February, 1882, disposing of his property? Objected to because under the facts as stated by the witness in his former examination the offer is incompetent. Objection overruled and bill sealed. A. My knowledge of Mr. Trich, extending over some fifteen years, leads me to believe that Mr. Trich was so controlled by his peculiar views as to render his mind unsound in the way of providing for his family, in the way of making a will." [12]

Plaintiff proposed to examine defendant's witness T. N. Boyle on the stand in relation to answers by God to prayer as stated by John Wesley in his Journal; all the cases referred to being cases where John Wesley himself, or a party referred to by him, called upon God in prayer in case of sickness and other cases and there was an answer by God to the prayer and the sickness disappeared, or the visible cause, whatever it was, disappeared. This is to be taken from Leckey's History of England, vol. 3, page 89, which contains references to the pages of Wesley's Journal, in which these cases are recorded ; the book to be proved at the proper time. Objected to as hearsay, incompetent and irrelevant. Objection sustained and bill sealed. [13]

The court charged as follows :

" This is a case of considerable interest and involves some principles of law of quite a novel character, so far as their application to a case of this kind is concerned. In cases that come so close to the line, it is very difficult to so distinguish between one side and the other as to enable even the court to satisfactorily and concisely state to the jury the principles upon which the case may be decided so as to enable them to receive it as they would if their minds had been particularly trained in that direction. Here, we are to consider the line 'between what

may be called fanaticism, or absurdity, and insanity, and I will do the best I can to lay before you the principles of law which control a case of this kind.

"The question involved is what we call testamentary capacity; that is, the ability of a man to make a will,—his legal right to make a will,—and that depends upon whether or not the testator is of sound mind and memory. Now the Supreme Court has said: 'A testator is of sound memory in contemplation of law when he has understanding to dispose of his estate with judgment and discretion, and this is to be judged of by his words, actions and behavior at the time and before the time his will is executed ; before the time as affecting his mental capacity at the time.'

"I may be as crazy as a man can be, and yet, if I become sane and perfectly sound in mind to-morrow, or next day, or next week, or whenever it may be, I have entire power and right to make a will, and it is binding upon everybody interested in my estate.

"['That the testator entertains unusual, erroneous, foolish, or even absurd ideas on certain subjects is not evidence of mental unsoundness unless they are shown to have operated on his testamentary disposition, his mind being otherwise sound and clear.' That, perhaps, is the gist of this case.] [3]

"All these views that Mr. Trich had have no bearing on the case unless the evidence has shown the jury that they operated on his testamentary capacity or disposition ; in other words, affected his disposition of his property under this will. The Supreme Court again says: 'A man of sound mind and disposing memory,'—and that is the way we generally designate one having a testamentary capacity,—'is one who has a full and intelligent knowledge of the act he is engaged in ; a full knowledge of the property he possesses ; an intelligent perception and understanding of the disposition he desires to make of it and of the persons and objects he desires shall be the recipients of his bounty. It is not necessary that he collect all this in one review. If he understands in detail all that he is about and chooses with understanding and reason between one disposition and another, it is sufficient for the making of a will.'

"The first question then is: What would justify a jury in saying that a man has not testamentary capacity ? Or, in a

case like this, what may be considered in law as insanity of a
nature and character sufficient to destroy such capacity ?   In
this case, there is no evidence of undue influence by the benefi-
ciaries ; nothing to indicate that they had anything whatever
to do with the making of the will, therefore that is outside of
the case.   There was admittedly no incapacity to attend to the
general duties incident to the business life of the testator and
the care of his property.   That is admitted by the parties who
undertake to set aside this will, but it is claimed that his mind
was unbalanced and to a certain extent abnormal upon the
doctrine of faith as applicable to the things of this life ; in other
words, that he was a monomaniac on that subject.

" It has been properly said that ' the speculative belief any
individual may entertain concerning the present or future
state, things natural or supernatural, religion, politics, educa-
tion, or any of those agitating problems upon which men think
and divide in sentiment, should be properly considered an
affair of his own conscience, and it is within very narrow
limits that any such belief can be confidently pronounced a
delusion.'

" The general term insanity is delusion, and the books, med-
ical as well as law, speak of insanity as a delusion.   In this
case, we use the word delusion as I will define it hereafter.
Delusion, of course, in the ordinary sense, does not mean insan-
ity ; [and insanity, in all cases, does not mean delusion,] [4]
but in most cases, men who are insane labor under certain
delusions and ideas that are false.   Sometimes men imagine
themselves to be somebody else, sometimes something else.   I
have read of one man who imagined himself to be a coffee-pot
and thought coffee could run out of his hand as the spout.
Some imagine themselves to be the Deity; the queen of Eng-
land ; president of the United States, and all that sort of thing.

" [And so long as one's course of conduct in pursuance of
his opinions does not transcend the laws which public policy
sees fit to prescribe for society, there is no reason why he should
not, by testament or will, as by gift when living, promote with
his fortune the views to which he has attached himself.] [5]
Upon such considerations wills are justly made which, without
neglecting the claims of natural affection, endow churches,
seminaries, and societies for the propagation of truth in accord-
ance with the testator's own creed.

" [The law does not prohibit a man from giving money to his church, and if the evidence shows that he does it in view of the surrounding circumstances, he can give all his property to his church (except the legal provision for his wife) either while living or by will after his death.] [6]    His children have no natural right nor no legal right to it.    There is an obligation upon all of us to look after our families, yet the law recognizes the absolute right of a man, if he is sane, to dispose of his property absolutely as he pleases except in the case of his wife.    So far as his children are concerned, either those of his own blood or his by adoption, he can leave them without a cent and the law would justify it, provided he was not laboring under mental trouble—insanity, or undue influence which would take away his testamentary disposition.

" If, then, the insane delusion exists without any other appearance of incapacity, but, on the contrary, testamentary capacity is apparent in all other respects, the essential question is whether the insane delusion, the monomania, has affected the will and the particular disposition made by it.    The will of a person who believes in witchcraft, magic, ghosts, and spectral influence, whether supernatural or only mysterious, is not on that sole account void.    Nor does the mere faith or belief in any other particular thing of that character of itself justify a jury in saying that any disposition the testator may make of his property is void, and particularly where the disposition of his property does not run in the direction of his peculiar notions.    Where it does, of course the views that he may have held, in connection with the disposition of his property, are to be considered by the jury as bearing upon his testamentary capacity.    If I believe in witches, as some ignorant people do even yet, and give my property to my children in the ordinary way, of course the will would not be set aside simply because I believe in witches, but if I gave it to somebody that I supposed was a witch, and it would appear that I was under some terror or dread of evil if I did not do it, that would justify the jury in saying that I was laboring under a monomania.

" [The belief in clairvoyance, mesmerism, faith cures or other matters upon which the majority are skeptical is not enough to avoid a will.    It must appear from the evidence that the will

was the offspring of such belief.] [7]   That is claimed to be
the case here.

" Chief Justice COCKBURN, of England, in an English case,
says : 'The only legitimate or rational ground for denying tes-
tamentary capacity to persons of unsound mind is the inability
to take into account and give due effect to the considerations
which ought to be present to the mind of the testator in mak-
ing his will, and to influence his decision as to the disposition
of his property.   It follows that a degree or form of unsound-
ness which neither disturbs the exercise of the faculties neces-
sary for such an act, nor is capable of influencing the result,
ought not to take away the power of making a will.   It is only
the delusion or conception which springs up spontaneously in
the mind of the testator and is not the result of extrinsic evi-
dence of any kind, that can be regarded as furnishing evidence
that his mind is diseased or unsound ; in other words, that he
is subject to an insane delusion.   If, without evidence of any
kind, he imagines or conceives something to exist which does
not in fact exist, and which no rational person would, in the
absence of evidence, believe to exist, then it is manifest that
the only way in which his unnatural belief can be accounted
for is that it is the product of mental disorder.   Delusions of
this kind can be accounted for upon no reasonable theory except
that they are the creations of some derangement of his mind,
in which they originated.'

" What our individual or collective opinion may be as to
facts, truths, possibilities or evidence, or claims of the effect of
faith as understood by the testator, has nothing to do with the
question before us.   [What you may think individually or
collectively as a jury as to the truth of the views of Mr. Trich
upon this particular question of faith alone, separate from any
other matter, has nothing to do with this case.   That is a mat-
ter for him alone, in his judgment.   It is only as to the proof
of the effect of this belief on the testator's mind that is before
us.   Did this belief unsettle his intellect or make him of
unsound mind within the meaning of the law ?   Even if true,
—that is, if his belief were actually true,—it might produce
that effect by long-continued and exclusive and fanatical thought.
To illustrate : Nobody doubts that the church ought to be sup-
ported, and yet there is such a thing as fanaticism ; and even

the giving of all a man's money to the church under some circumstances, where his mind is unbalanced as to his duty and he disregards his family, leaving them probably in want, and he has an idea that the church, and the church alone is the only thing to be considered, it might go to a degree of fanaticism that would justify the jury in finding that the man was laboring under an insane delusion.] [8]   And yet a man has a right to give his money to the church if he has testamentary capacity, and the fact that he gives it to churches, charity, hospitals, or anything he may think is for the public good or individual benefit, does not in itself justify a jury in finding that he was insane.

   " There are questions constantly arising in relation to mere speculative belief in abstract propositions of theology, law, or other matters.   The mere speculative belief in abstract propositions we may think very absurd ; we may not be able to see how anybody can believe certain creeds or doctrines, yet others may believe them and not be insane.   Even religious opinions or mere speculative belief may, however, rest so upon a person's mind and work so on his intellect ; may so upset his mental power generally, or partially, or topically, on particular points, that he may become insane, arising from this very cause.   And we have all so understood, even if we have not known persons who have become insane upon religious subjects. There are people in Dixmont to-day who have gone crazy from views that they have happened to entertain with reference to religion and the future state, and it so affected their minds that they became not simple monomaniacs, but insane.

   " Where one's mind becomes greatly excited on the subject of his belief (it may be faith, religion, or anything else) and it becomes his hobby, even makes him troublesome and a bore to some or many of his acquaintances and friends, is of no importance at all in this matter, if he retain his memory and .his usual shrewdness in the management of his worldly concerns, and was not by some delusion in relation to his views on faith in this particular case so possessed as to prevent his comprehending and appreciating his ordinary obligations to those naturally entitled to his bounty.

   " Now upon the whole matter ; [it is for the jury to decide, not whether the peculiar views of the testator were, scriptural

or otherwise, sensible or absurd, but simply whether or not they so impressed his mind, became, as it were, so incorporated into his mental constitution as to control his judgment in regard to the use and disposition of his property, so as to prevent his perceiving or appreciating the ordinary duty he owes to his family, or their claims upon him as a father in that respect. If the jury should so find in regard to this question, and also that this will was made under a controlling influence, then they should find against the validity of the will; that is, in favor of the defendants.] [9]   But on the contrary, if the evidence does not fairly lead you to such conclusion, that is to say, does not lead you to believe that the testator's mind was overpowered and controlled by his peculiar views so as to prevent him from exercising a reasonable or rational judgment in relation to the disposition of his property, your verdict should be for the plaintiff, however absurd, ridiculous or unfounded you may individually or collectively believe his peculiar ideas on faith and its effects to have been.   If he had capacity to make a will, that is sufficient, no matter how unjust or unreasonable or injudicious its provisions may seem to others.   As said by Judge GRIER, one of the judges of the Supreme Court of the United States, and formerly of this county, in a case where he sat as judge in the United States Court: 'A testator has a right to make an unreasonable, unjust, injudicious will, and his neighbors have no right, sitting as a jury, to alter the disposition of his property simply because they think he did not do justice to his family connection.'"

Plaintiff's points were as follows :

1: Request for binding instructions.   Refused. [1]

" 2.   A will cannot be set aside on the ground of want of testamentary capacity in its maker, unless it is made under an insane delusion, and the jury has no right to consider that to be an insane delusion which rests upon evidence, whether they consider the evidence to be sufficient or not; nor have they any right to consider that as an insane delusion which is a matter of opinion or faith.   *Answer:* Affirmed as a general proposition.   But when the opinion is such as is susceptible of actual refutation by practical experience or observation, and is not to all of us a mere matter of speculation, it may be evidence of delusion or mental aberration.   Within the limit of

mere speculation or religious belief, not capable of positive ref-
utation, the point is a correct statement of the law.   In other
words, mere belief, however absurd it may be, will not, unless
it amounts to a perversion of reason, be considered as an insane
delusion.   As a whole, the point is refused." [2]

Verdict and judgment for defendants.   Plaintiff appealed.

*Errors assigned* were (1-9) instructions; (10-13) rulings,
quoting instructions and bills of exceptions; (14) that the
charge as a whole was misleading and did not furnish the jury
any sufficient standard as to what constituted testamentary
capacity.

*W. B. Rodgers, R. C. Rankin* and *J. H. Beal* with him, for
appellant.—A will cannot be set aside unless it is made under
an insane delusion : Middleditch v. Williams, 45 N. J. Eq. 726 ;
Brown v. Ward, 53 Md. 376 ; Keeler v. Keeler, 20 N. Y. St.
439 ; Redfield on Wills, 74.

That cannot be considered an insane delusion which is a
matter of opinion or faith : Bonard's Will, 16 Abb. Pr., N. S.
128 ; Gass v. Gass, 3 Hump. (Tenn.) 278 ; Keeler v. Keeler,
20 N. Y. St. 439.

The fact that a man's beliefs or opinions are true, are sensible
and are scriptural is at least some evidence of soundness of
mind, and the jury should be permitted to take this into con-
sideration in reaching a verdict: Thompson v. Thompson, 21
Barb. 107 ; Story's Will, 20 Ill. Ap. 183 ; Brown v. Ward, 53
Md. 376.

The delusion which will justify setting aside a will must be
a morbid delusion irresistibly overpowering his reasoning fac-
ulties: Robinson v. Adams, 62 Me. 369 ; Walcott v. Alleyn,
1 Milward (Irish Ecc. Cas.) 65 ; Denson v. Beazley, 34 Tex.
191 ; Smith's Will, 52 Wis. 543 ; Chaffin's Will, 32 Wis. 557 ;
Fraser v. Jennison, 42 Mich. 206 ; Merrill v. Ralston, 5 Redf.
220 ; Phillips v. Chater, 1 Demarest, 533 ; Otto v. Doty, 61
Iowa, 23 ; Keeler v. Keeler, 20 N. Y. St. 439 ; Lee v. Lee, 4
McCord, 183.

It was error to permit Blackstone to express the opinion that
testator's religious ideas would control him in making his will.
It will be observed that this witness had already testified that

he could not say he was insane, and had further stated that he was very competent to make a will pleasing to himself.

The witness, Codville, was permitted to express his opinion as to whether testator was fit and competent to make a will, against our objection that he had not testified to any facts entitling him to give an opinion: Dickinson v. Dickinson, 61 Pa. 402; Elcessor v. Elcessor, 146 Pa. 359; Shaver v. Mc-Carthy, 110 Pa. 339.

Appellees admit that this is John Trich's will; that he knew the extent and value of his estate; that the will was made after careful deliberation; that he knew his children and their condition in life, and that he knew and fully understood the provisions and effect of the will. Thus in this case there is admittedly every essential to testamentary capacity, as defined by this court in Wilson v. Mitchell, 101 Pa. 495; and followed in Miller v. Oestrich, 157 Pa. 270; Cauffman v. Long, 82 Pa. 72.

*A. M. Brown, E. P. Douglas* and *John D. Brown* with him, for appel ees.—A disposing mind and memory is one in which the testator is proved to have, at the time of executing the will, a full and intelligent knowledge and understanding of the act he is engaged in, a full knowledge of the property he possesses, and an intelligent perception and understanding of the disposition he desires to make of it, and the persons he wishes to be beneficiaries of his will and recipients of his bounty: Tawney v. Long, 76 Pa. 106; Leech v. Leech, 5 Clark, 91; Wilson v. Mitchell, 101 Pa. 495; Daniel v. Daniel, 39 Pa. 191.

Incompetency by reason of insanity is to be sought for in the words, actions and behavior at and about the time of the act in question: Boyd v. Eby, 8 Watts, 66; Converse v. Converse, 21 Vt. 168; Harrison v. Rowan, 3 Wash. C. C. 580; Boughton v. Knight, L. R. 3 P. & D. 64.

Proof of insane delusions is sufficient to defeat a will, where the will is the offspring of such insane delusions.. Where the delusions thus operate the will is void: Leech v. Leech, 5 Clark, 91; affirmed in 21 Pa. 293; Boyd v. Boyd, 66 Pa. 291; Boughton v. Knight, L. R. 3 P. & D. 64.

On the question of mental incapacity, evidence that the testator, who had been mild, amiable, etc., had become harsh, suspicious and obscene is proper, although on some subjects he may have been sound: Bitner v. Bitner, 65 Pa. 347.

Declarations of a testator made after the execution of his will are admissible as evidence of imbecility of mind. It is not necessary, in order to set aside a will, that derangement of intellect be proved. Imbecility of mind, short of insanity, is sufficient for that purpose: McTaggart v. Thompson, 14 Pa. 149; Wilkinson v. Pearson, 23 Pa. 117; Titlow v. Titlow, 54 Pa. 223; Bricker v. Lightner, 40 Pa. 199; Irish v. Smith, 8 S. & R. 573.

On an issue of devisavit vel non, a witness may be asked " whether, from his actual knowledge of the alleged testator, he considered him fit or unfit to make a will: " Wogan v. Small, 11 S. & R. 141.

In Storey's Will, 20 Ills. Ap. 183, the report of the case does not disclose that any delusion under which the testator labored had entered into the making of his will.

In Brown v. Ward, 53 Md. 376, the report does not show that the provisions of the will were in any way affected by any disorder of the testator's mind.

In Gass v. Gass, 3 Humph. (Tenn.) 278, and Robinson v. Adams, 62 Me. 369, the court held that " the question of sanity or insanity is a question peculiarly for the decision of the jury."

In Thompson v. Thompson, 21 Barb. 107, the will was expressly sustained on the ground that no matter how absurd and ridiculous opinions and beliefs a man might hold, if he was in other ways mentally responsible and his peculiarities did not control his will, it must be sustained.

In Bonard's Will, 16 Abb. Pr. N. S. 128, the court expressly finds that there was no evidence that any delusion or defective mental state affected the disposition of the property of the testator in his will.

In Dew v. Clark, 3 Addams (Eng. Ecc. R.) 79, it was held that an insane delusion avoids a will if the provisions of the will are founded on it, no matter how sane the testator may be on other subjects. The question of sanity is a fact for the jury.

In Middleditch v. Williams, 45 N. J. Eq. 726, it was decided that even though a man has an insane delusion, yet if it appears that such delusion neither influenced him nor was calculated to influence him in making his will, and he had sufficient mental power to take into account everything necessary to the making of a proper will, the will must be upheld.

OPINION BY MR. JUSTICE WILLIAMS, Jan. 7, 1895 :

There is no subject that has given rise to more extended discussion in legal and medical circles than insanity. The tests by which its existence and extent are to be determined; the stage of development at which moral accountability ceases; the circumstances under which civil accountability ought also to cease, and contracts to lose their legal value because of the want of mental capacity on the part of him who enters into them to form an intelligent judgment or give an intelligent assent, have been and still are the subjects of earnest debate. The whole subject is however better understood than formerly, notwithstanding the want of entire harmony in the conclusions that have been reached. In this case we are confronted with one of the most difficult and delicate questions to be encountered in the whole range of the discussion. The controversy is over the testamentary capacity of one who is admitted to have been competent to contract, and to have been successfully conducting a large business requiring careful and intelligent personal supervision. The testator was a man of good intellectual endowments although his education was limited. His habits were temperate. He was industrious, energetic, economical, and conducted his business operations with more than the average measure of business sagacity. In the common or general sense of the word he was a thoroughly sane man. The evidence shows that the religious side of his nature was strongly developed in his early life. He became an active member of the Baptist Church in McKeesport where he lived, and appears to have been gentle but earnest and persevering in his efforts to do good to those with whom he came in contact. Gradually he seems to have undergone a change in views which affected his attitude toward his church and towards church work. He came to regard all forms of religious effort, including preaching and pastoral visitation, as the personal duty of the preacher and pastor, for which no compensation should be charged or received. If done in reliance on God's care he held that God would care for the person who served Him. He interpreted in the most literal manner the sayings of Christ regarding the power of faith, and the duty of an implicit trust in God. His attention was attracted to the subject of faith cures, and to certain institutions said to rest on no pecuniary foundation or endowment, but on the faith

of those who conducted them. In two of these, that of George
Müller, in Bristol, England, and that of Dr. Charles Cullis, of
Boston, he became particularly interested. He visited the lat-
ter, spending some days at it, and returned to his home con-
firmed and strengthened in the peculiar views that led to the
visit. About 1880 he began to give largely, for one of his means,
to both these institutions. He kept a diary in which many of
his donations were noted and in which his peculiar views found
expression in the most simple and unaffected manner. His will
was prepared and executed on the twenty-second day of Feb-
ruary, 1882. He did not die until 1893.

During the years following the execution of his will his
mind seemed drawn more and more to his relation to God, to
the importance of faith, and to the comparative worthlessness
of the usual methods of church work and worship. There
was no sudden change noticeable in him at any time. His
peculiar religious ideas had become quite pronounced at least
ten years before his will was made. He sought to propagate
them by personal intercourse with his neighbors and by occa-
sional missionary tours. He prepared and circulated tracts.
He opened a room that he called Faith Chapel in his own
house where he conducted religious services and taught his
peculiar views about faith. He tried to train up a band of dis-
ciples to propagate his views and to work cures by faith.
Upon the shoulders of one of these he threw his own robe
with the declaration that God told him to do so in order that
the power that he (Trich) possessed might be communicated
thereby to his disciple. Failing to gather converts from among
the members of his own family or from his neighbors he seems
to have grown cold toward them and finally to have regarded
them with a strange mixture of indignation and pity. When
his son Judson was sick he said he thought his own faith would
be sufficient to keep him alive. After his son died he said
"the poor boy hadn't faith," and had died for that reason;
adding that he "did not expect to die because he had sufficient
faith to keep himself alive." Of his family generally he did
not speak unkindly, said one of the witnesses, but he appeared
to feel as though he was "called upon by the Lord to reject
them entirely if they persisted in refusing to obey the teach-
ings of faith," as he understood them.

Entertaining these views, when he made his will he did not mention his children. He provided for his wife during her life but gave his entire estate to the institutions in which he had been so much interested, in equal parts, viz: The Orphan House of George Müller, at Bristol, England, and the Consumptives' Home at Grove Hall, Boston. The part given to the latter he directed should be used for "the support of Faith Training College at Boston, and the free distribution of the Holy Scriptures." His children are shown to be reputable in character, and frugal and industrious in their business habits. No other ground of estrangement is known to exist except that which he himself stated to Blackstone when he said "his children were such he didn't know whether the Lord wanted to have anything to do with them," and that because they did not accept his views about faith "the Lord had bid him to leave them to themselves." He regarded himself as in business for the Lord rather than for himself, and said he was directed by the Lord to give his money to the two institutions to which his will devoted his entire estate.

From this glance at the facts it is apparent that the general sanity of the testator is not denied. Upon all subjects except one he seems to have acted as other men act, and to have entertained opinions such as many admittedly sane men hold. The allegation is that upon one subject he was under a delusion which for many years controlled his action and which led him at last to disinherit his children. The point is a narrow one. His views about faith were extreme but they are substantially held by many persons whose sanity is not questioned. His belief in the possibility of cures as the result of the exercise of faith on the part of patient or healer or both together, is a belief practically identical with that held by many other persons who reject all remedies when sick and rely on what is variously called faith cure, mind cure, christian science or the like. The question is not so much what he believed on these subjects, as what effect had his beliefs on his mental condition? Did his beliefs unsettle his judgment and leave him under the influence of a delusion that usurped the place of reason and controlled his will? If this was his condition, then, as to this subject, he did not have a "sound disposing mind and memory," although as to every other subject his soundness be conceded.

Partial insanity is enough to defeat a will when the will is the result of such mental condition : Williams on Executors, 33 ; Tawney v. Long & Wife, 76 Pa. 106.

By partial insanity is meant, not some intermediate stage in the development of mental derangement, but disturbance at some particular point not involving the mind at any other point. A person thus affected is said to be under the influence of a delusion : Cassiday on Wills, 467. A will made under the influence of such delusion is the result of the peculiar form of insanity generally spoken of as partial insanity, and when the fact is clear that the will was so made, its probate should be refused. What shall amount to a delusion is not easy of statement. Redfield speaks of a delusion as " a creation purely of the imagination such as no sane man could believe : " Redfield on Wills, 67. In Taylor's Medical Jurisprudence, 629, it is described as " a belief in the existence of something that does not exist." The proof of the existence and influence of delusion in any particular case may be found in the surrender of the will to imaginary directions regarded by the victim as the directions of God, or of spirits, speaking to him from another world, or to the control of an impulse due to an imaginary state of facts. The mental processes of such a person may be orderly and logical but they rest on false assumptions. A leading case on this subject is Dew v. Clark in which SIR JOHN NICKOLL distinguished between partial and general insanity, and showed that where partial insanity was said to exist this did not mean that a man could be partly sane and partly insane on the same subject, but that he could be insane on one or more subjects, and sane on all others. In such a case action upon one subject might be the result of an insane delusion, while upon another subject action might be sane and well' considered. Partial insanity according to Doctor Hammond is a derangement of one or more faculties of the mind which prevents freedom of action : Hammond's Insanity in its Medico-Legal Relations, 9. The question in any given case is therefore whether the act under investigation was done upon consideration of existing facts, or under the influence of a delusion that controlled the will of the doer and destroyed his freedom of action.

We think the learned trial judge fully comprehended this distinction, and that his charge taken as a whole presented it

fairly to the jury. There are sentences, such as form the basis of the third and seventh assignments of error, that, standing alone, would be wanting in clearness and definitiveness of statement, but when the charge is considered together it cannot be said to be misleading. In summing up his discussion of the capacity of the testator he said to the jury that they were not to decide upon the soundness of the peculiar views entertained by him "but simply whether or not they so impressed his mind, became as it were incorporated into his mental constitution, as to control his judgment in regard to the use and disposition of his property, so as to prevent his perceiving or appreciating the ordinary duty he owes to his family or their claims upon him as a father in that respect." He then added that if they found "this will was made under a controlling influence," such as he had described in his charge as the result of delusion, they should find against the will. On the other hand, he said to them, if the evidence did not fairly lead to the conclusion that the testator's mind was overpowered and controlled by his peculiar views so as to prevent him from exercising a reasonable or rational judgment in relation to the disposition of his property, their verdict should be in favor of the will "however absurd, ridiculous or unfounded you may individually or collectively believe his peculiar views on faith, and its effects, to have been."

The distinction was clearly taken between the absurdity of the views or delusions to which the testator might hold and their effect in overturning his judgment and directing his conduct; and the jury was told in effect that the views or delusions were in themselves harmless unless they had unsettled the testator's mind and controlled his will in the disposition of his property. This was a correct statement of the rule, and the assignments of error to the charge of the learned judge are not sustained.

The tenth, eleventh and twelfth assignments of error are more troublesome. The examination of the witnesses was conducted in a manner that was calculated to lead the jury to lose sight of the distinction on which the case rested, viz : the distinction between general and partial insanity. General mental disturbance was not alleged. In fact sanity upon all subjects save one was admitted. The testator was competent to make

a will unless he was subject to a delusion that so dominated his judgment as to render him insensible to the considerations that control the action of persons not so afflicted. The questions for the jury were therefore, first, was John Trich subject to a delusion amounting to partial insanity? Second, what was the character of his delusion, and to what did it relate; and, third, did it control his judgment and direct a disposition of his property made by his last will and testament to any, and if so to what extent?

His will provided for the payment of his debts, for the marking of his grave by suitable head and foot stones, for the support of his wife during her life, for the sale of his real estate and the execution of deeds therefor by his executor, and the collection into one fund of the proceeds of his entire estate. All this is in accordance with a very common practice, and shows a very clear knowledge of the extent and character of his estate and a recognition of his duty to his wife. It is only in his treatment of his children that his alleged delusion appears. He discards them, and gives his entire estate to two institutions alleged to be dependent upon the faith of their proprietors for their daily income. Was this disposition of his estate the result of a controlling delusion? This is the question on which the contestants must stand. The course of the examination lost sight of this. The question put to Tilbrook was whether the testator " was competent to make a will and dispose of his property?" The learned judge felt that this was not the proper question and interposed the query whether the witness ought not rather to be asked whether the testator was sane or insane? But both forms of the question are subject to the same objection. They overlook the distinction between general insanity and the existence of an insane delusion. The witness Blackstone felt the difficulty of correctly answering the same general question. He said that the testator was competent to make a will pleasing to himself. He was then asked if the testator's "ideas and opinions would or would not affect his judgment in the disposal of his property?" The learned judge correctly excluded the question for the reason, no doubt, that the fact that the judgment is controlled by one's " ideas and opinions " is an evidence of sanity rather than of the existence of insane delusion. The witness Codville was

asked the same general question whether John Trich " was fit and competent to make a will in February, 1882, disposing of his property?" It was not denied that he was fit and competent except as to such subject or persons as might come within the range of his delusion, yet the witnesses were allowed to give an opinion that he was not fit or competent, in the same manner that would have been allowable if general insanity had been alleged.

The learned counsel for the contestants hold that the case of Wogan v. Small, 11 S. & R. 141, is an authority for this line of examination; but that case is not in point. The allegation there made was that the testator was incompetent because of general insanity and his general mental condition was therefore a proper subject of inquiry. Even in such a case the better form of question is that suggested by the learned judge of the court below on the examination of Tilbrook. The subject under investigation being the existence of general insanity the question ought to be directed to the mental condition of the testator.

Testamentary capacity is presumed, and the burden of proof rests on him who denies its existence in any given case : Grubbs et al. v. McDonald et al., 91 Pa. 237. When the presence of insanity is shown the presumption shifts and incapacity is a legal conclusion. But to show insanity the witnesses must first testify to facts from which they reach the conclusion that the testator is insane. They may then give their opinions about his mental state or condition, and the general question whether he was sane or insane is proper: Dickinson v. Dickinson, 61 Pa. 401 ; Titlow v. Titlow, 54 Pa. 216 ; Shaver et al. v. McCarthy, 110 Pa. 339 ; Elcessor v. Elcessor, 146 Pa. 359.

Here general insanity was not alleged. The incapacity, if any existed, grew out of the existence of a delusion resulting in partial insanity. Was his last will, so far as it affected his children, the result of the peculiar delusion to which he was subject? Did he omit to make any provision for them for reasons resting on an existing state of facts such as might influence the action of a sane man ? Or did he overlook their relation to him and his own parental obligation, under the influence of an insane impulse or the direction of an imaginary communication from God or from the spirits of the dead ?

There was evidence before the jury from which they might find the existence of a delusion, and that his children were disregarded under its influence; but whether their verdict did in fact rest on such of the evidence as was properly before them or was influenced by evidence that should have been excluded, it is impossible now to determine. We are compelled therefore, although with great reluctance, to send this case back for another trial in which the investigation may be confined to the questions on which the contest must rest, viz: Was the testator the victim of a delusion? Did this delusion affect his position towards his children and render him insensible to his parental obligations? Was so much of his will as gave his estate to the two institutions named in it instead of to his own children the result of his delusion?

The judgment is reversed and a venire facias de novo awarded.