Argued December 15, 1943; affirmed January 18, 1944

IN RE MURRAY'S ESTATE

HANKINS *v.* MABEE ET AL.

(144 P. (2d) 1016)

Before BAILEY, Chief Justice, and BELT, ROSSMAN, BRAND and HAY, Associate Justices.

*O. D. Eby,* of Oregon City, for appellant.

*Arthur G. Beattie,* of Oregon City, for respondents.

BRAND, J.   On the 22nd day of January, 1940, Katie Murray, being then of the age of seventy-four years, executed an instrument as her will.   It was published, declared and witnessed as required by law. She died on November 26, 1940.   On November 29, 1940, George M. Hankins, whom she had nominated as executor, filed a petition praying that the will be admitted to probate.   On the same day the original instruments and the affidavits of the subscribing witnesses were filed.   The will was admitted to probate and letters testamentary were issued.   Hankins qualified as executor and proceeded to administer the estate under the terms of the purported will.   The inventory showed a personal estate of $4762.25.   The property, both real and personal, was reduced to cash, and the final account showed a balance on hand for distribution

in the sum of $3857.30. Thereafter this contest was instituted.

Difficult questions have been presented concerning the identity and capacity of the named beneficiaries to take the bequests, but we shall first consider the evidence concerning the mental capacity of the deceased. If that issue be resolved in favor of the contestants, the other issues will become immaterial.

■ Bearing in mind that the burden of proof was on the proponents to establish the testamentary capacity of the deceased (*In re Sturtevant's Estate,* 92 Or. 269, 178 P. 192, 180 P. 595; *In re Johnson's Estate,* 162 Or. 97, 91 P. (2d) 330), we look to the evidence. It clearly appears that Mrs. Murray, the testatrix, consulted Mr. O. D. Eby as her attorney concerning the making of a will. Mrs. Ellen M. Jones, who was Mr. Eby's niece and stenographer, testified that she knew Mrs. Murray and that she was present in the office when the deceased discussed the making of a will, that she typed the will and signed as an attesting witness. She testified that Mrs. Murray "seemed very certain" as to what she wanted to do, but upon the first visit was uncertain concerning the proper addresses of the beneficiaries. Later and before the will was fully typed, Mrs. Murray again came to the office and furnished the addresses of the beneficiaries. The will was read to her, she signed it and it was properly attested. The will itself contains the usual provisions for the payment of debts, funeral and probate expenses, and the like. The will directs the executor to reduce the estate, both real and personal, to cash and then disposes of it by three bequests, as follows:

"A one-third part thereof to First Hebrew Christian Synagogue, 2209 Michigan Avenue, Los Angeles, California.

"A one-third part thereof to Portland Hebrew Mission, 2406 Southwest First Avenue, Portland, Oregon.

"A one-third part thereof to Four Square Gospel Church, 1403 Seventh Street, Oregon City, Oregon."

The will does not enumerate her property or refer to any of her heirs at law or relatives, although the evidence discloses that she was on very friendly terms with them. The will recites that she had no lineal descendants. Upon the first visit of the testatrix to Mr. Eby's office, Mrs. Jones had no conversation with testatrix. On the second visit when the will was executed, her only conversation was to ask the testatrix if she wanted her (Mrs. Jones) to witness the will and to inquire what it was that she was signing. However, Mrs. Jones was in the room with the testatrix and Mr. Eby for about a half an hour on the day the will was signed. Concerning the time when the will was signed, the witness testified that she did not know whether it was discussed or not but qualified her answer by saying:

"It was discussed, of course, but it was typewritten and it was ready for her."

Concerning the degree of her acquaintance with Mrs. Murray, the witness said:

"I have known Mrs. Murray,—Mr. Eby is my uncle, and I have been at his house a number and number and number of times, and I have known Mrs. Murray through him."

In answer to an inquiry as to whether Mrs. Murray was sane or insane, the witness said: "Oh, sane; never another thought." This constitutes the substance of her testimony on mental capacity. Mr. Eby, the attorney who drew the will and the other attesting witness,

testified that he had been a close neighbor of Mrs. Murray, knew her very well and had resided in the next block to her for many years. As a witness he testified to the following effect: The testatrix told him that she had no children, but had some relatives;

> "I think she said a sister or two somewhere in the east * * * she hadn't seen them for a long time, and that she wanted to give her estate to some Jewish Christian institutions."

She had been attending meetings "along that line." On the first visit, she had been uncertain concerning the names and addresses of the beneficiaries. She returned to his office the next day with the information and also with a letter-head she had received from Dr. Michelson of Los Angeles, who was the head of the First Hebrew Christian Synagogue in that city. The will was then completed, and it was executed. The testatrix took the will to her friend, Mr. Hankins, secured his consent to act as executor and returned it to her attorney. Mr. Eby testified further that "at the time she seemed quite normal to me." He noticed nothing unusual and "She surely knew what she was doing." Below the attestation clause on the original will, there appears a notation written and signed by Mrs. Murray as follows:

> "A savings account with Oregon City Branch of the United States National Bank.
> "Six Hundred Dollars worth of Preferred Shares in the Portland General Electric Company, in Safety deposit Box No. 817."

The notation contains no reference to her real estate. The stock to which reference was made appears from the report of the appraisers to be Portland Electric Power Company stock certificates, "no value."

Mrs. Murray was not Jewish but was greatly interested in converting the Jews to the Christian religion. On rebuttal, Mr. Eby amplified his testimony as to his long acquaintance with the testatrix and testified as follows:

"Q Did she know what she wanted to do with her property?

"A She sure did. She wanted her debts paid, if there were any. She wanted to be buried, wanted a monument on her grave, a stone for herself and Joe, as she said, and then she wanted these three churches to have this money for that purpose, for the conversion of the Jewish people."

He explained her eccentricities by saying that "she was emotional, and that the Four Square Gospel Church is made up of emotional people, people that wouldn't be happy in other churches, and she liked to go there." He said there was nothing during the conversation with her that indicated to him that she was not in the proper state to make a will. With one exception later to be noticed the foregoing constitutes the substance of Mr. Eby's testimony relative to the mental capacity of the testatrix.

The only two witnesses who testified for proponents on the issue of mental capacity were Mr. Eby and his niece, Mrs. Jones. It is to be observed that their testimony was restricted almost entirely to the mental condition of the testatrix on the two occasions when she was in her attorney's office.

Proponents had also intended to call Mr. Hankins as a witness, but they were informed that he had not returned from a funeral. The parties therefore stipulated that if called Mr. Hankins would have testified that

" * * * he talked with her *at the time she brought the will to him* and that nothing occurred that

caused him to think that she was mentally un-
balanced or anything of that kind; that he had
known her for a good while.'' (Italics ours.)

The only other witness for the proponent was not
acquainted with Mrs. Murray and could give no testi-
mony concerning her mental condition. Proponents
did, however, elicit evidence which they contend tends
to explain the extraordinary conduct of Mrs. Murray.
Mrs. Murray attended the Four Square Gospel Church
in Oregon City. Witness Reverend Meyer Tan Ditter,
Pastor of the Portland Hebrew Mission, explained that
the Four Square Church was a ''Pentecostal body.''

''They are a religious, very fanatical religious
group, but that doesn't mean they are crazy.''
''They are firm believers in shaking and prais-
ing God in spiritual growth. They are firm believers
in spiritual emotionalism * * * .''

The witness thought there was nothing extraordinary
for a member of that church to ''pray out loud, talk to
themselves, talk to the Lord Jesus, carry on in that
general way.''

Opposing the evidence of the proponent, we have
the testimony of eight well qualified witnesses, most
of whom had no interest in the result.

The husband of the testatrix died on December 26,
1939, or about one month before the execution of the
will. Witness Lickingteller had for four years lived
just across the street from Mrs. Murray, the two
houses being about one hundred and thirty feet apart.
He testified that from the time of her husband's death
until her own decease in November, 1940, Mrs. Murray
would ''go around hollering and crying and different
things like that, making a noise.'' The witness could

hear her in his house. He noticed other peculiarities but could not explain them.

"Just the way she would look and act and walk around all the time."

The witness did not think she had her right mind.

Mrs. Ada Monroe, a witness called by contestants, had known the testatrix since 1902, "As well as my own sister," and was with her two or three days a week. She testified that Mrs. Murray was "frantic, just gone frantic on religion." Her mind wholly rested on religion. She wanted to die. The witness wondered sometimes if it was safe for her to stay there by herself. Shortly after her husband died, the witness went to Mrs. Murray's house. She testified as follows:

"She [Mrs. Murray] was upstairs, and she was going around, and she was talking. I thought she had somebody with her and she was working around up there and setting things down, and I could hear it, and she was talking and then answering, and I thought sure she had someone with her, because she said, 'Now you just know that is an absolute lie.' Well, I didn't go upstairs, I set her bundle down and went back home, and pretty soon she came back over to my place and she says, 'Oh, Jesus, Jesus, Jesus.' She said, 'Mrs. Murray [Mrs. Monroe], didn't you know I was there?' I said, 'Yes, you was upstairs, but you had somebody with you.' 'Oh,' she said, 'I didn't have nobody with me at all.' She was all alone, she said, no one but Jesus was with her.

"Q Did you call her attention to what she said?

"A I did, I called her attention to it. I said, 'Why, Mrs. Murray, you wasn't talking that way to Jesus, was you?' 'Oh,' she says, 'Mrs. Monroe, you just know me, oh, you know me!'"

"A She just acted insane to me at times, because she was continually talking to herself. She would talk and answer, just like she was talking to somebody.

"Q Did she grow worse after her husband's death?

"A Yes, she did."

" * * * the way she acted I thought she was off balance. If I would get up and act that way in church you would say I was ready for the insane asylum."

" * * * I think there was times she was just simply ready for the insane asylum.

"Q Now, Mrs. Monroe, just when were those times?

"A Well, when she would get to cutting up right there at home. She would come over to my house and do the same thing. I call that a crazy act."

After the death of her husband, the witness accompanied Mrs. Murray to the bank. She was "taking on" to such an extent that the banker made inquiry of the witness if she was "all right." In answer to a question by the court the witness stated that she did not think Mrs. Murray's mind was clear.

Mrs. Rose Hux had known testatrix for several years, and for five years had lived close to her. She testified:

"Well, I just figured her mind wasn't altogether right. She was just worrying and fretting. I think she just mostly went crazy over religion and lost her mind over her husband."

"She was praying and going on. She screamed and hollered."

Mr. J. D. Monroe had known the testatrix since 1902, and they had been close friends. He testified that Mrs.

Murray had been very dependent upon her husband during his life and that it seemed that she was not competent. His death "worked on her mind." He testified:

"Sometimes she was quite loud, and she couldn't sit down nowheres, it seemed when I have seen her, but what her mind seemed to be working. Her lips was moving like as though she was listening to herself. You could just see her lips moving. She would sit in a steady stupor, like, and her lips would be moving, and sometimes she would make motions like she was just in earnest, and things that ordinarily people you would not see do, it seemed to be working on her mind. I couldn't say that she was exactly crazy. I wouldn't want to say that. There is times that I think she was quite rational, but I think at times her mind was in bad shape."

\*    \*    \*    \*    \*    \*

"THE COURT: But when it came to religion, how about that?

"A I thought she was quite considerably off, and she dwelt on that a great deal."

Witness Fowler was the husband of one of the contestants. They had visited Mrs. Murray for three weeks in September, 1940, subsequent to the death of Mr. Murray. He testified:

"In all the time we were there I should judge there wouldn't be over two hours at a time that she wouldn't be talking to herself or praying or asking God to take her, that she wanted to die. The radio, whenever there was a religious speaking or speech or prayer on, or sermons, it was always on at that time, no matter where the sermon was from or from what church, it didn't matter. She wanted to listen to the prayers and talk on religion. Time after time I asked my wife to go out and try to quiet her when she would be outside, and her voice would be

quite loud in talking. She would talk to Joe, to her husband who was dead, as if he were there present.''

■■ The court refused to permit the witness to state his opinion concerning sanity, because his visit was subsequent to the making of the will. We think this was error. Evidence both before and after the date of the execution of the will was relevant as bearing upon her general mental condition. *In re Morley's Estate,* 138 Or. 75, 5 P. (2d) 92. However, the error is immaterial in the view which we take of the evidence.

Witness Jennie Everhart, a sister, had not seen the testatrix for twelve or fifteen years, but she testified concerning and offered in evidence letters of the testatrix, which we think showed a morbid condition of mind on the subject of religion, predicting the end of the world and expressing a desire to die. The testatrix invited the witness to come and stay with her after Mr. Murray's death.

Dr. A. H. Huycke, a qualified physician, testified to extended experience in the examination of many persons concerning sanity, and in answer to a hypothetical question which reviewed much, but by no means all, of the matters testified to by contestant's witnesses, gave an opinion that the assumed facts could denote insanity but did not necessarily do so. The assumed facts did, however, denote senility, senile decay, and he added:

    '' * * * in that case, a person senile to that extent probably wouldn't, in my opinion, be very clear on her ideas of business.

    ''Q Well, would you say whether or not her mind would be in such condition that she wouldn't know who were the objects of her bounty and what property she had and what she truly wanted to do with it?

"A I think her mentality would be so changeable that she wouldn't understand."

He thought that the hypothesis submitted to him indicated a hallucination. Speaking of persons who apparently held communications with spirits, counsel inquired:

"And when the party was not having those communications, would they revert back to normal?

"A A younger person might. A woman of seventy-four is generally so senile that the moments between would not be lucid enough to have a clear conception. They change while in the course of a conversation.

"Q And if the lady had been that way for a long period of time, having these prayers and communicating with her Christ, you would think that condition existed over all that time; is that right?

"A Not necessarily, because a person can pray and be perfectly normal. We all pray, and most of us are normal. Because a person prays to Christ doesn't mean they are abnormal, but when you converse with Christ in a loud manner, and say, 'You are a liar', or something to that effect, that is a different thing.

"Q Any person who would do that, you would determine that they were ——

"A Senile.

"Q Senile?

"A Or incapable of good judgment."

Witness Lovisa Johnson had known the testatrix well since 1924 and had visited with her frequently. She testified:

" * * * We saw her quite often.

"Q (By Mr. Eby) Well, I know you did, and during those intervals of time, now, there were times when she seemed to be in that deep study and thinking.

"A Yes.

"Q And talking?

"A Yes.

"Q And then there were other times when she wasn't, isn't that it?

"A Yes, just like other people I have seen, and I know they were insane."

She testified further that Mrs. Murray's nature was just so dependent that "she couldn't depend on herself for anything." The evidence indicates that this complete dependency upon her husband had a material influence in accentuating the effect of his death upon her mind. "She was very fanatical." In answer to the court's question, the witness testified:

"A Well, when it come to Hallowe'en time, if she saw a picture of a black cat, she says, 'That is the devil, that is just the same as the devil in your home.' If you had a picture of a black cat, just the picture. You mustn't have anything like that. Well, I call it fanaticism."

She acted "a little beside herself."

For the purposes of brevity, we have omitted comment on much of the testimony. It is fair to say, however, that all of the witnesses who knew her well testified at length concerning her talking to herself, and several of them heard her conducting dialogues, no other person being present. It is conclusively established that she "hollered," screamed and acted in a very abnormal manner, making statements and then answering herself. The record contains no contradiction of the very substantial testimony of the witnesses for the contestants. As we have indicated, Mr. Eby expressed the opinion that she was sane, but he too testified that he had heard her talk to herself and that his wife used to go over to console her. He testified:

" * * * and then I was there after he died, and she grieved very much, as the ladies have testified to here. She missed old Joe, but she talked, she thought old Joe was all right. He was going to the right place, and she wanted to go with him, just as the ladies have testified, and she did want to die. There are lots of folks would like to get out of this world and go on to the other place, and they are not all crazy.

"Q And you talked with her a number of times after her husband's death prior to the time that she came in your office for this will?

"A Well, I wouldn't say a number of times, but I have talked with her about it, yes. I have heard her talking to herself over there."

■ Upon consideration of the entire record we think that the proponents have failed to sustain the burden of proof upon the issue of testamentary capacity. It is hardly possible to frame a single definition, applicable to all cases, of "sound mind" as that term is used in the statute O. C. L. A. 18-101, which authorizes the making of a will by a person of "sound mind". The general considerations which control decision in cases of this kind are set forth *In re Johnson's Estate,* 162 Or. 97, 91 P. (2d) 330; *In re Shank's Estate,* 168 Or. 650, 126 P. (2d) 504, and many earlier decisions. We have no disposition to impair the authority of those cases but, as stated in the Johnson case:

"In determining what is meant by 'sound mind', this court in Estate of Allen, 116 Or. 467, 471, 241 P. 996, stated that the term 'sound mind' as used in the statute is synonymous with 'sane mind'. The opinion therein quotes with approval from 32 C. J. 621, as follows:

" 'The terms "unsound mind" or "of unsound mind" are generally held to include every phase of unsound mind rendering one incapable of caring

for himself or his property; every species of un-soundness of mind. These terms are of such variable significance that their value in any given case will depend entirely upon the relation that they bear to a particular person in connection with a particular act under inquiry.' " *In re Johnson's Estate,* 162 Or. 97, at p. 129, 91 P. (2d) 330.

Again we have said:

"No particular degree of acumen will serve as a standard for testamentary capacity. Each case is to be decided upon its own facts and circumstances. The question is, Was the will the free and intelligent product of the testator's mind or not? 1 Schouler on Wills (5 ed.), § 88 et seq.; Galt v. Provan, 108 Iowa, 561 (79 N. W. 357, 360)."
*In re Estate of Riggs,* 120 Or. 38, at 48, 241 P. 70; 250 P. 753; and see *In re Failing Will,* 105 Or. 365, 208 P. 715.

■ There are special considerations which the law deems relevant in cases involving the type of mental derangement which is disclosed here. It is true as urged by the appellant that the existence of senility, extreme eccentricity and great distress of mind or body does not of itself amount to testamentary incapacity. *In re Will of Robert Carr,* 121 Or. 574, 256 P. 390; *Clark v. Clark,* 125 Or. 333, 267 P. 534; 1 Page on Wills (Lifetime Edition), Sec. 148. Nor does the fact of religious fanaticism, belief in spiritualism or in the possibility of communication with departed spirits of itself establish testamentary incapacity. 1 Page on Wills, supra, Sec. 149. But it is a different thing to say that evidence of this kind may not be relevant. In the case of *Barr v. Sumner,* 183 Ind. 402, 107 N. E. 675, there was evidence that the testatrix was a believer of spiritualism and was of unsound mind. The proponents of the will requested an instruction to the effect

that the evidence concerning spiritualism had no bearing on the case. It was held that the trial court had correctly refused to give the requested instruction. The court said:

"It is true that a belief in spiritualism, of itself, in no wise impairs the right of testamentary disposition more than does a credence in any other religious doctrine or system or philosophy. Our Constitution guarantees religious liberty, and the statutory right to make a will is not limited to those who discard a belief in any particular cult, dogma, or principle. Steinkuehler v. Wempner (1907) 169 Ind. 154, 81 N. E. 482, 15 L. R. A. (N. S.) 674, and monographic note thereto. But a belief in any religious doctrine, philosophical system, or science may be vitally material, in connection with other facts and circumstances, in determining the question of one's testamentary capacity." *In re Barr v. Sumner,* 183 Ind. 402, 107 N. F. 675, at p. 677.

From a case which bears ᴊse resemblance to the one at bar, we quote the touowing:

"The law takes no account ᴏf a man's religion. It cannot say that, because oᵣ man believes in the generally accepted dogmas ʜᴊ is sane, and another is insane because he rejects them and announces some new doctrine that may shock the sensibilities or disturb the religious fervor of some devout believer in the so-called orthodox faith. But, while this is true, the courts have recognized the fact that a man may through manifestations of religious belief evidence mental disorder; and, while testamentary capacity is not to be measured by religious belief or opinions, yet if these opinions are of a nature which produces a will which is wholly the result of them, in other words, if the will in question would not have been made if the testator had not entertained some peculiar religious belief, his testamentary capacity may well be doubted. Underhill on Wills, p. 139."

*Ingersoll v. Gourley*, 78 Wash. 406, 139 P. 207, at p. 209 Ann. Cas. 1915D, 570.

██ The evidence discloses that the testatrix was suffering from senile decay which had developed into a monomania. Her mental derangement and her delusions manifested themselves chiefly as a religious fanaticism which had reached the degree of frenzy, and which apparently dominated and controlled her mind. We think she suffered from what was once called partial insanity, that is, insanity upon a particular subject only but, as said by a learned author:

"The terms 'monomania' and 'partial insanity' are open to the objection that they imply the theory of the mind referred to as the compartment theory: namely, that a person may be insane upon one subject and perfectly sane upon another. This theory is now generally rejected by psychology, and monomania is explained as a type of insanity which is manifest only upon certain subjects, though it undoubtedly affects the whole mind." 1 Page on Wills (Lifetime Edition), Ch. 7, Sec. 142.

██ It may well be that a person suffering from this type of insanity can under some circumstances make a valid will. The test is whether the form taken by the mental disease touches the subject matter of the will. *Morley v. Silverton Hospital*, 138 Or. 75, 5 P. (2d) 92; *McClary v. Stull*, 44 Neb. 175, 62 N. W. 501; *In re Trich's Will*, 165 Pa. 586, 30 Atl. 1053.

██ The proponents rely upon the rule set forth *In re Failing Will*, supra. That case recognizes that a will made by an insane person may, nevertheless, be held valid if it was executed during a "lucid interval". But if, as in this case, the testatrix was suffering from a continuing derangement of mind, it does not necessarily follow that she was sane on the day she executed

the will, even though she may have then appeared rational to the superficial observation of the attesting witnesses. We think it is for this reason that it was held in the Failing Will case that where habitual insanity is once established, it may be disproved at the moment of the execution of a will ONLY BY CLEAR AND CONVINCING PROOF. This is not a case of partial insanity, but rather of general insanity manifest in a particular manner.

> "Testimony of attesting witnesses to the competency of the testatrix may be overcome by competent evidence, circumstantial or direct, notwithstanding that it does not cover the particular day the will was executed, if it does cover a reasonable time before and after the day." Headnote, *Ergang v. Anderson,* 378 Ill. 312, 38 N. E. (2d) 26, 137 A. L. R. 984.

In the case at bar, the mental disorder of the testatrix took the form of religious frenzy which, we think, absorbed and dominated her mind and judgment to such an extent that she was incapable of acting rationally upon matters within the area in which her delusions and her mental derangement manifested themselves.

■ Two final considerations lead us to the conclusion that the decree of the circuit court should be affirmed. This may be said to be a close case, but the burden of proof was upon the proponents and we think they have failed to sustain it. Furthermore, the trial court had the benefit of observing the witnesses, and upon observation, appraising the value of their testimony. In cases of this kind, the conclusion of the circuit court judge sitting in probate is a matter to which importance should be assigned. *Morley v. Silverton Hospital,* supra; *In re Dale's Estate,* 92 Or. 57, 179 P. 274; *In re Darst's Will,* 34 Or. 58, 54 P. 947.

The decree of the circuit court is affirmed. The estate has already been administered by the executor who acted under the purported will. Upon the filing of a supplemental account as provided in the decree, and after such notice and hearing as may be required by law, and upon the approval of the accounts of the executor, the assets will be distributed as provided in said decree.

Neither party will recover costs.