Argued October 7, affirmed October 21, 1959

IN THE MATTER OF THE ESTATE OF
MARY A. GAFFNEY, DECEASED
BRADFORD *v.* DOLLANSKY, EXECUTOR

345 P. 2d 396

*Alton John Bassett,* Portland, argued the cause and filed a brief for appellants.

*Gerald J. Meindl* argued the cause for respondent. On the brief were Meindl, Mize & Kriesien, Portland, and Sheldahl & Misko, Oregon City.

Before McAllister, Chief Justice, and Perry, O'Connell and Redding, Justices.

O'CONNELL, J.

In this suit the plaintiff, daughter and sole heir at law of the decedent Mary A. Gaffney, contests the purported will of the decedent on the grounds of mental incapacity and undue influence. The defendant, brother of the decedent is the proponent of the will. He was named as executor and also as a beneficiary. The dispositive provisions of the will which was dated February 11, 1948, were as follows:

"SECOND, I give and bequeath unto John C. Dollansky, my brother, my home with all of its furnishings at 9105 41st Street, Milwaukie, Oregon, together with one thousand dollars.

"THIRD, I give and bequeath unto my daughter, Jennie Bradford, all the rest and remainder of my property."

The lower court held that the decedent did not possess testamentary capacity to execute a will on February 11, 1948, and also held that the instrument was executed as a result of undue influence exercised by the defendant.

At the time of her death on August 7, 1955, the decedent was approximately 70 years of age. She had been ill both physically and mentally for many years before her death. Her condition was so critical

in November, 1947 that her doctor demanded that she enter St. Vincent's hospital in Portland. The records of that hospital from November 19, 1947 to December 15, 1947, the period during which she was attended there, reveal the decedent's state of mental ill health. The hospital charts during this entire period carry such notations as the following: "Disoriented—talking irrationally—talks incoherently—screaming—restraint applied—very confused—wandering down hall looking for rubbers. Says husband (who has been dead many years) was here last night. (However, her brother was here yesterday)—found wandering in hall —patient is a 62-year old female in a confused state of mind making history totally unreliable."

She was committed to the Oregon State Hospital on December 16, 1947. Just before leaving St. Vincent's hospital the following entry was made on her hospital chart: "Patient quite confused as to time element, present happenings and people" and finally, the notation on December 15, 1947: "General physical condition improved but this patient is a mental case." The following day she was committed to the Oregon State Hospital. The record for her first two days at the Oregon State Hospital contains similar evidence of mental derangement. The hospital notes read: "Patient has been peculiar for years, worse past few weeks * * *. Memory poor—disoriented. * * * Delusions: believes everybody steals from her. Hallucinations: sees dead mother and sister around—restless, noisy, destructive." Another notation on the same day states, "Says her brother is outside—she can hear him beating with a sledge hammer."

Except for these notations the record on appeal does not contain the hospital records from the time of decedent's admittance to the hospital on Decem-

ber 16, 1947 to May 11, 1948 which, of course, includes the crucial period just before the will was executed in the Oregon State Hospital on February 11, 1948. However, we find references to the records for this period in the transcript of testimony. Two entries are particularly significant. One stated, "Provisional diagnosis: psychosis with cerebral arterioscleroisis" and the other, "Ultimate diagnosis: psychosis with cerebral arteriosclerosis." Dr. Jere Nelson, a doctor of medicine was called to testify as to the meaning of these and other terms used in the hospital's clinical history of decedent. He explained that "psychosis" is the name given to true mental disease usually based upon some organic changes in the brain, and that "cerebral arteriosclerosis" is the term which describes the hardening of the arteries of the brain. He testified that the latter disease was "permanent and progressive." The hospital record which follows the missing portion referred to above contains references to the decedent's mental illness much like those appearing in the earlier records. During this period it is recorded that decedent "is troubled with various delusions"—"cheerful, friendly and cooperative but occasionally confused and unable to recognize people she has known for a long time"—"totally disoriented as to time and place"—"believes it is 1925 and she is about twenty years younger than she is"—"insists on hoarding trash, has to be cleaned out frequently"—"up and out of bed looking for husband"—"keeps thinking she sleeps in the clothes closet."

██ The whole course of the available clinical history substantiates the diagnosis made upon her reception at the state hospital. It would be possible, however, that the decedent executed the purported will during a lucid interval. The testimony of the subscribing

witnesses, Dr. Ruth Jens and Anna E. Carver, lend support to that view. Dr. Jens was the staff psychiatrist at the Oregon State Hospital under whose care the decedent was placed during a part of the period of her commitment. She testified that at the time decedent executed the will "she was of average intelligence and she knew what she was doing"; that she discussed her property "very freely and very sensibly"; that Dr. Jens had talked to the decedent "about her will and her bequests  *  *  *  and she knew that the purpose of whatever it was that she signed  *  *  *  knew its purpose and knew its contents and knew the implication"; that "she knew what her property was"; that "She spoke about so many details in connection with the property that there was no question of her having known about it and she told me many times that it was adjacent to her brother's property and other identifying things. It made it clear to me she knew what she was talking about." These conclusions as to the decedent's knowledge of her property and her capacity to execute a will are weakened by other statements made by Dr. Jens.

On May 11, 1948 Dr. Jens made the notation on the clinical record of decedent, "She has forgotten about her assets but recalls many facts when reminded." In a letter dated February 10, 1948 (one day before the purported will was signed) written by Dr. Jens to the attorney who drew the will, she stated, "She [Mary Gaffney] had the impression that she had no funds and was quite surprised to know that she has money in the amount you stated." We do not regard Dr. Jens' general conclusions as to the decedent's testamentary capacity as overweighing the specific evidence of the decedent's mental confusion concerning her property and the natural objects of

her bounty. The testimony of Anna Carver throws little light on the specific elements necessary to establish testamentary capacity. The decedent was judicially pronounced a mentally diseased person on December 16, 1947 by the circuit court for Multnomah county when she was committed to the Oregon State Hospital. There is a presumption that this condition continued to exist. *Wenker v. Landon, et al.,* 161 Or 265, 88 P2d 971 (1939); *In Re Dugan,* 158 Or 439, 76 P2d 961 (1938); *Johnson v. Johnson, et al.,* 124 Or 480, 264 P 842 (1928). Where the mental disease is diagnosed as "permanent and progressive" the evidence to overcome the presumption should be clear and convincing. *In Re Murray's Estate,* 173 Or 209, 144 P2d 1016 (1944); *In Re Faling Will,* 105 Or 365, 208 P 715 (1922).

■ It is our opinion that the evidence in this case was not sufficient to overcome the presumption. We are also of the opinion that the contestant has established the exercise of undue influence by defendant in procuring the execution of the will. We shall not extend this opinion by a recitation of the facts clearly proving such influence.

The decree of the lower court is affirmed.