Argued March 16; affirmed June 13, 1939

IN RE JOHNSON'S ESTATE

McRELL *v.* LOOMIS ET AL.

(91 P. (2d) 330)

Department 2.

*W. Lair Thompson* and *Bardi G. Skulason,* both of Portland (Skulason & Skulason and McCamant, Thompson, King & Wood, all of Portland, on the brief), for appellants.

*John F. Reilly* and *John F. Logan,* both of Portland (Stephen W. Matthieu, of Portland, on the brief), for respondent.

BAILEY, J. On February 27, 1938, Pearl L. Johnson died, leaving a will dated October 8, 1937, which document was admitted to probate in common form March 2, 1938. By the terms of the will all the property of the decedent was devised and bequeathed to John Wayne Loomis and Joyce Loomis, nephew and niece of the decedent and children of Hazel Loomis, executrix of the will. The decedent's estate in Oregon was ap-

praised at $17,344.17. In addition thereto, Miss Johnson at the time of her death was the owner of an undivided one-third interest in a 360-acre farm in Illinois. The other undivided interests were owned by her two sisters.

This contest was instituted March 8, 1938, by Eva McRell, sister of the decedent and Hazel Loomis. The principal grounds on which the contest is based are (1) that at the time the will was made the decedent was of unsound mind and mentally incompetent, and (2) that the will was executed as the result of undue influence on the part of Hazel Loomis. The contestant asks that the order admitting that document to probate in common form be vacated, annulled and set aside and that a decree be "entered to the effect that the pretended will of the decedent dated October 8, 1937, is not the true will of the decedent and further declaring that said Pearl L. Johnson died intestate". From the decree of the circuit court for Multnomah county, department of probate, declaring the purported will to be null and void on the grounds set forth in the contestant's petition, Hazel Loomis and her two children as sole legatees and devisees have appealed.

At the time of her death Pearl Johnson was an inmate of the state hospital at Salem, to which institution she had a few days previously been committed. She was 56 years of age and had never been married. Her only heirs at law were her two sisters, Eva McRell and Hazel Loomis.

All three sisters were born in Wisconsin, where they spent their early youth. Later they moved to Illinois, where Eva McRell was married in 1910 and her sister Hazel, the youngest of the family, was married the next year. In 1914 the McRells, Mrs. McRell's

father and mother and her sister Pearl came together to Oregon, and all lived together on acreage at Multnomah, a suburb of Portland, from 1916 until the parents died—the mother in 1928 and the father in the following year. The McRells and Miss Johnson, until the latter was removed to Salem, continued living together at Multnomah.

Hazel Loomis and her husband, Dr. Loomis, also moved to Oregon, where their children, Wayne and Joyce, were born in 1917 and 1919, respectively. In 1925 Dr. Loomis died, and Mrs. Loomis and her children thereafter made their home for two or three years with the McRells and Johnsons. About the end of that period a home was built for Mrs. Loomis and the children on an adjoining tract of land, where they have since resided.

Up to a year or a year and a half before her death, Miss Johnson was a vigorous and apparently robust woman, weighing about 175 or 180 pounds. She was very industrious and active in the work about the house, the gardening and the care of the chickens. Witnesses describing her as of that time state that she was "very modest", "friendly" and "agreeable".

Miss Johnson was an earnest reader of the Bible. She was a member of the Presbyterian church at Multnomah, where she was a devout and faithful attendant and worker. Mr. and Mrs. McRell were also members of that church and Mrs. McRell was a frequent attendant. The McRells and Miss Johnson had many friends in common among the church members. Their friends were largely the same outside that circle as well, and generally all three went together in making visits.

After Mrs. Loomis took up separate residence Miss Johnson was practically a daily visitor at the

Loomis home. She often had lunch and dinner there, but never remained over night. She was extremely fond of Wayne and Joyce. Regularly she brought to the Loomis home eggs which she had gathered.

The Loomis family was also supplied with vegetables and fruit from the McRell-Johnson garden and orchard. The McRells and Miss Johnson kept a cow, and daily set aside in their refrigerator a quart of milk for the Loomis family, for which Wayne or Joyce regularly called.

Upon the death of Dr. Loomis, Mrs. Loomis found it necessary to support herself and her two children. Her vocation, as she explained it, was coaching plays and training people "in the speech art". Mrs. Loomis's friends and associates were different from those of her sisters, and her habits and amusements were also different.

From the great preponderance of the evidence there appears to have been none but the most friendly feeling between the Loomis and McRell-Johnson households until after Miss Johnson's death, although Mrs. Loomis and her son and daughter at the trial of this case intimated that prior thereto there had been hostility toward them on the part of the McRells, existing for some years. However, the McRells turned over their beach cottage to Mrs. Loomis, her children and their friends for part of every summer. They showed a great deal of affection and consideration for Wayne and Joyce, providing them with a riding horse and the use of an automobile. Both Wayne and Joyce were in the McRell-Johnson home almost daily.

About a year or so before Miss Johnson signed the purported will she began to lose weight, and by September, 1937, her weight had dropped from 175 or 180

pounds to around 140 pounds, and she began to appear and act really ill.

On September 13, Miss Johnson was taken by her two sisters to the Coffey clinic in Portland for observation and hospital care, and she remained there until September 16. The hospital chart, which was prepared by the nurses and supervisors having charge of Miss Johnson, and which was admitted in evidence without objection, contains the following notations: 2 A. M., September 14: "Pt. [patient] in B. R. (washing walls & wash bowl)—persuaded to go to bed." 10 A. M., same date: "Pt. talks to herself a great deal." 6 P. M., same date: "Pt. wandering around halls—voided involuntarily." 10 P. M., same date: "Pt. roaming around halls—insists on cleaning sinks and scrubbing floors—not willing to give up scrub bucket." This scrubbing continued until 12:45 that night. 7 P. M., September 15: "Pt. up to lavatory—insists on sitting in bath tub." This chart contains many other details not necessary to set forth in this opinion.

Two of the supervisors who had charge of Miss Johnson were called as witnesses. Both were graduate, registered nurses, one graduated in 1902 and the other in 1917. According to their testimony, Miss Johnson was first placed in a ward with three or four other patients, and she was frequently out of bed, scrubbing the floor and walls of the bathroom. During the time that she was in the hospital her face was blank, without expression. She wandered about the ward and halls so much, sometimes nude, that she was placed in a private room, which, however, did not deter her from continuing to scrub the floors and walls. She had absolutely no control over her physical functioning, according to these witnesses. Both testified that her dis-

order or ailment was mental more than physical. She did not appear to know what she was doing and seemed to have the mind of a very young child.

Dr. Manville, who was connected with the Coffey clinic, attended Miss Johnson at her home two or three times preceding her removal to the clinic. He also attended her at the clinic and again at her home when she returned there. The clinical record which was prepared under his supervision and at the trial was produced from the files of the clinic and hospital, sets forth as his final diagnosis, under date of September 20, 1937, based upon his entire observation and the patient's history, the following: "Mental confusion; disorientation." The clinical record contains a further explanatory statement concerning the patient's condition, as follows:

"Patient is still in pretty good flesh although she has lost in the neighborhood of 30 pounds in the last few months. She is sleepy nearly all the time and has very poor conception of time. Acts sometimes as if she were in a daze. Does not know when it is bedtime. Will stay in the toilet for an hour or so at a time, etc. Patient did not seem to know it was Sunday yesterday. She started doing work she would not ordinarily do on Sunday."

As a witness, in explaining what he meant by "disorientation", Dr. Manville said: "Disorientation means that the patient has lost all ability to place herself in space and time; that is, day is like night; Saturday is like Sunday; the things that she would do on Monday she would do on Sunday; the things that she would do in the daytime she would do at night; all loss of proper spacing and timing; completely disoriented."

Dr. Manville testified that he had known both the McRell and the Loomis family for 14 years and had acted as physician for Joyce Loomis, Mrs. McRell and the elder Johnsons. When asked what he found Miss Johnson suffering from when he called upon her before her removal to the hospital, he answered: "Well, the chief complaint, very largely, was one of sleepiness, of inability to differentiate in time and place, the normal course of events, of prodigious and insatiable appetite, incontinence." Dr. Manville stated that when he was at Miss Johnson's home prior to her hospitalization he was shown a letter which she had started to write and had never finished. In explaining the peculiarity of the letter he said: "Well, the outstanding thing in the letter that was of unusual interest to me, from the mental standpoint of the patient, was what we would label 'perseveration'; that is, the tendency of the patient to keep writing over and over and over the same thought,—not being able to get away from that one idea very successfully; constant repetition." He referred to the fact that in the letter "she kept repeating constantly the same statement over, about— I think it was one of them [her niece and nephew] was about to graduate—'graduate this spring' or 'graduates this spring'; I don't know exactly what the idea was, but it was a constant repetition of that idea."

In describing Miss Johnson's condition further, Dr. Manville stated:

"She was not alert. She did not volunteer questions or answers, or remarks of any sort. She was entirely passive, in other words, entirely receptive to questionings or comments of others, and in some instances—well, those were the chief instances, in which she would enter into any conversation at all, would be just in response to direct questioning. As far as I

know personally, she did not ask a question voluntarily, or interject a sentence in the conversation voluntarily on her own initiative at all.''

Then followed this testimony by Dr. Manville:

''Q. Now, that seems to be somewhat inconsistent with her refusal to give up the scrub bucket, her insistence on scrubbing the floors and walls of the hospital: how do you account for that difference in that particular from her ordinary receptive and docile attitude in respect to other matters? A. Well, that's an extremely difficult question to answer, but I can only give you my personal opinion on that. Q. All right; that's what we want. A. The nurse says, noted on the chart, 'Encountered considerable resistance on her part at times in getting back to bed or giving up the scrubbing.' It almost seemed as if she were obsessed with the idea that she was carrying out a duty or responsibility, and as long as that idea persisted that she had so dominantly, it was very difficult to persuade her to do anything else; but in between times, when she was not engaged in any activities of that sort, she was an entirely passive individual.''

There is further testimony by Dr. Manville, to the effect that Miss Johnson's hands were constantly in motion, ''either fussing with her clothes or with some object that she might have been holding''.

Dr. Manville made it clear that he did not regard himself as a psychiatrist or a specialist in mental disorders or diseases of the brain.

The facts hereinabove set out are those concerning which there is no dispute, with the exception of the feeling and relations between the McRells and the Loomis family, and the diagnosis by Dr. Manville. There is controversy, however, regarding some of the matters which we shall now mention.

It would be impossible within reasonable limits to set forth and analyze the large body of evidence introduced at the trial relative to the mental capacity of the decedent. We shall therefore confine our statements to a general summary of the evidence.

Both the contestant and the proponents of the will produced some 18 witnesses each in addition to medical experts and the members of their own immediate families. The contestant's witnesses, with the exception of the two nursing supervisors whose testimony has already been mentioned, were relatives of the decedent, or personal friends who had known her quite intimately for many years. Two of the proponents' witnesses were related to the decedent, and most of their other witnesses were their own personal friends.

We shall first discuss the testimony of the contestant's witnesses. Attention has been directed to the fact that Miss Johnson began to lose weight about a year or more before her death. A number of witnesses testified that as early as April, 1937, her mind apparently was becoming affected. Miss Johnson's condition both physically and mentally became worse as time passed. A number of witnesses noticed a marked change in her in June, July and August. She was beginning to lose interest in things that she was accustomed to do about the house. She did not enter into conversation as formerly.

On Labor Day, September 6, 1937, the McRells noted a decided change in Miss Johnson. On that date, about midnight, she arose, dressed, went downstairs and built a fire in the range. Mrs. McRell followed her downstairs and when she asked her sister what she was doing the latter answered, "I am getting breakfast." After considerable urging Miss Johnson

was persuaded to lie down on the davenport. After Labor Day she did not do any work about the house or in the garden. She lost interest in the things that had formerly claimed her attention. She did not thereafter attend church or show any interest in church matters.

On September 9 Miss Johnson went with Wayne Loomis and Mrs. McRell to visit one of their relatives near Eugene, Oregon. Some of the witnesses who saw her on that occasion, members of the relative's family, expressed the opinion that she had lost her mind. A few days after her return to Multnomah she was taken to the Coffey clinic and hospital for observation.

Many of the contestant's witnesses had known Miss Johnson, the McRells and Mrs. Loomis for many years and were equally friendly with all. Most of them saw Miss Johnson frequently prior to October 8, the date the will was signed, and thereafter until her death. Both before and after October 8 Miss Johnson was noticed many times to be slapping her legs vigorously for protracted periods, which she accounted for by saying that it made her feel better. Her hands were constantly in motion. She tore curtains and sometimes her own clothing, without offering any reason for so doing. There was a great deal of testimony about her unconsciousness of her own eliminatory functioning and her lack of concern or embarrassment in that connection. She apparently lost all sense of modesty, although when normal she had been notably decorous. When she attempted to read a newspaper she frequently held it upside down, or when she had it in proper position and appeared to be actually reading it she seemed not to know when she reached the end of

a column. She had hallucinations about the presence of her father, who had been dead for some years. There is considerable testimony about her having lost the power of coordination. Witnesses stated that she did not seem able mentally to direct or control her muscular action.

After Labor Day, Miss Johnson did not at any time appear animated. Her face wore a blank expression. She seemed not to know one day from another. When she was addressed she often did not answer, and such response as she made was generally a monosyllable. Several of the witnesses who had been well acquainted with her for years stated that she seemed not to recognize them. Before she began to fail she had been a ready conversationalist and had seemed to like discussing various subjects. During the summer of 1937 she had very little to say, and after Labor Day she did not carry on any extended conversation at all. Her mental and physical condition grew gradually worse.

There was a great deal of discussion of Miss Johnson's mental condition in the late summer and fall of 1937, among her relatives and close friends. According to the testimony of a number of witnesses, Mrs. Loomis was fully aware of her sister's condition and discussed it with them.

We shall now refer briefly to the testimony of witnesses called by the proponents of the will. Three of these witnesses had not seen Miss Johnson during the year 1937. One of the three had not seen her in the last 10 years. They were called to prove that Miss Johnson was very fond of her nephew and niece and that she had said that she intended to leave her property to them or had otherwise intimated that they would have the use of her property after her death.

Three of the proponents' witnesses had played bridge at Mrs. Loomis's home on October 28, 1937. One of them, who had seen Miss Johnson about a year prior to meeting her that day at the home of her sister, stated that on the date mentioned she looked normal except that she was "thinner" and appeared to have been ill. On October 28, after eating lunch the other people were out of the room, leaving this witness alone with Miss Johnson, who then asked her "something about 'wasn't it nice that the youngsters had a car now to go to school in' and she said, 'Did you know that they are having it painted for them?' And I said, 'Oh, is that so?' 'Yes, they are having it painted red and black;' that was the extent of our conversation. The girls came back and I suppose we got out the cards." The diary of this witness fixed the date as October 28 for another of the bridge players who testified.

This latter witness had seen the decedent about a year prior to that date, when Miss Johnson brought plums to her. She had never at any time seen Miss Johnson, she stated, when the latter appeared otherwise than normal in every respect, except that she seemed to have lost some weight, the amount of which the witness could not estimate. On October 28 this witness saw Miss Johnson in the bedroom at Mrs. Loomis's home and asked her how she was, to which Miss Johnson replied, "Fine." Two weeks prior to the bridge party this witness was present at the home of another witness when Mrs. Loomis called there. Miss Johnson was in Mrs. Loomis's car, and when asked by this witness how she was, answered, "Fine." Questioned then as to whether she knew the witness, Miss Johnson merely answered, "Yes." The witness supposed that Miss Johnson recognized her, although she

did not address her by name. This witness further testified that Mrs. Loomis had told her a number of times that Miss Johnson's "mind and her body were affected", but she could not approximate the time when Mrs. Loomis first told her that.

The other witness who was present at the card party on October 28 testified that she had seen Miss Johnson off and on at the Multnomah community church for very nearly 15 years. She did not know whether she had seen her more than once during the five years preceding Miss Johnson's death, but presumed that she had. On the occasion of the card party she noticed absolutely no change in Miss Johnson's appearance, even in her weight. Questioned as to her own conversation with Miss Johnson at that time, she stated that she asked her how she was feeling and Miss Johnson answered that she was "fine".

All three of these witnesses stated that they did not see anyone help Miss Johnson arise from the bed on which she was sitting or lying when they arrived, or assist her in seating herself or arising from a chair. These three witnesses had known Mrs. Loomis for a long time and had met Miss Johnson on only a very few occasions.

Another friend of Mrs. Loomis was at her home about the second week in October, where she took part in a bridge game. She did not remember who the other players were. She testified that she saw Miss Johnson in the bedroom but did not remember whether she spoke to her or not. In the latter part of October Miss Johnson accompanied Mrs. Loomis to the home of this witness. When asked by the witness how she was, Miss Johnson answered, "Fine." The witness further stated that she had seen Miss Johnson a few

times prior to the instances mentioned, but that "I wasn't personally acquainted with her, that is, any more than just to speak to her."

Three other witnesses were friends of the Loomis children. One of them saw Miss Johnson early in the summer at the McRells' beach cottage. The other two had casual contact with her around Christmas, 1937. One of the latter two was a young man of about twenty years. He showed Miss Johnson some pictures of himself and his sister dressed in formal attire, and Miss Johnson remarked, he testified, that they looked very nice, and "made a comment on the clothes." The third of this group of witnesses was a young lady, who said that Miss Johnson asked her about a young man she had seen in the young lady's company some two years previously and who had thereafter been ill.

Another of the proponents' witnesses saw Miss Johnson a few days after September 17, 1937. She marked that as the date of her husband's death, and said that a few days thereafter she took Mrs. Loomis and Miss Johnson for a ride. She stated that she knew Miss Johnson had been ill, but that "there was nothing peculiar about her", except that Miss Johnson said to Mrs. Loomis at least twice: "When I ask you to stop, stop the car and let me out." On cross-examination this witness said that she thought Miss Johnson looked "ill" and "much thinner". She had not heard anything about her mental condition.

One of the witnesses called by the proponents had known the McRells, Miss Johnson and the Loomis family about 10 years and during that time had called on the McRells some three or four times. She thought she had gone to see Miss Johnson about once a year during the past five years. She was an intimate

friend of Mrs. Loomis. When she went to the latter's home after Miss Johnson returned from the hospital she found Miss Johnson there, canning corn. No one else was present except Wayne Loomis. The witness stated that she noticed nothing unusual about Miss Johnson except that she "was thinner and was sick". When asked what she meant by the decedent's being sick, she answered that Miss Johnson complained about pain in her neck or shoulder. She saw Miss Johnson once after that, at which time the latter was "reading and trying on a dress".

The next witness had known the McRells, Miss Johnson and Mrs. Loomis for 27 or 28 years. The last time she saw Miss Johnson was between November 1 and 6, 1937. On that occasion she spent practically the entire day at the Loomis home. There were also present then a husband and wife whose testimony will next be discussed. The witness above mentioned had also seen Miss Johnson three or four weeks prior to the day she spent with her in early November, and she stated that she looked ill on both occasions but appeared to be better in November than previously. She testified that during her November visit Miss Johnson made biscuits. When asked whether the latter had "lost weight", the witness answered: "Well, I couldn't say, because I hadn't seen enough of her to know whether she had lost weight or not." As to whether she had talked with Miss Johnson in November, she said: "Yes, I did. She was very friendly that day. She asked me about my husband, who had gone on, said what a fine man he was; she seemed to remember that he was a fine man; I can't just remember all she did say, but we just visited at lunch." Later, on cross-examination she

said, after referring to the above-mentioned conversation: "I believe that's the only thing she said outside of, 'How was I', which she always did when she saw me."

The husband and wife above referred to as being at the Loomis home when the last previous witness was present had lived at Multnomah about 25 years and had known the McRells, Miss Johnson and Mrs. Loomis during that period. The wife testified that Mrs. Loomis and her children "have been my particular friends", but she had not seen much of the McRells during the past 12 or 13 years and had not seen Miss Johnson very frequently during her last years. This witness and her husband were at dinner at the Loomis home on December 17 or 18, 1937, and on that occasion saw Miss Johnson for a few minutes and merely spoke to her then. During her visit at Mrs. Loomis's home in the early part of November she was there for about an hour and a half, saw Miss Johnson there and "thought she seemed very normal". Previous to this November visit she had seen Miss Johnson, in August or September, at which time she "just spoke to Pearl. She acted like she felt very badly, and she looked very badly that day, but I didn't talk with her."

This same witness also testified that before Miss Johnson went to the hospital Mrs. Loomis told her that the decedent "vomited and was very ill at times, and she told me about that eating grapes out in the orchard, and how she had sort of overeaten a few times, and that they thought her mind had something to do with it at that time." She testified also that before Miss Johnson went to the hospital, Mrs. Loomis "was concerned about her mental and physical condition, both".

Speaking about Mrs. Loomis, the witness said: "And of course she had these reports from the hospital, how she [Miss Johnson] was acting and everything, I know she was very much worried, and of course she naturally thought her mind wasn't very good when she did those things at the hospital, but when she came home she seemed to improve mentally and physically."

The husband of the witness whose testimony is last above reviewed testified that he remembered having been at Mrs. Loomis's home in December, 1937, shortly before Christmas. He named the date of that visit as December 19. Asked how the decedent appeared on that occasion, he said: "To the best of my recollection she—I didn't see a great deal of her, but she was reasonably normal, I wouldn't say quite as much so as the last time I saw her, but there was nothing that I felt to be unduly alarmed about at that time." He saw her also early in November on the occasion above described. His testimony in that connection is as follows: "Why, on that particular day I didn't see anything to be alarmed about at all, knowing, of course, what she had been. I was aware of the fact that she wasn't normal at all, but at the same time, outwardly it seemed to me that she was perfectly normal from all her behavior in every way." He had not seen Miss Johnson for several months prior to the November meeting. He further testified that he had not seen her very often during the last eight or ten years. In this connection he gave the following testimony:

"Q. In the last ten years are you sure it was as often as once, or are you sure it wasn't only once in five years? A. I wouldn't say it was once in five years, or once in ten years; it wasn't at all like it used to be: I will say that."

Asked if he had noticed any difference in Miss Johnson's weight in November, the witness answered: "Well, I wouldn't say; she might have been weighing slightly less,—not a great deal, no. I wouldn't have thought anything of it if I hadn't heard what I had heard about her." He further stated that he had heard at various times from Mrs. Loomis about Miss Johnson's mind being affected.

Another husband and wife, who had known Mr. and Mrs. McRell, Miss Johnson and the Loomis family for 17 or 18 years, on learning that Mrs. McRell had suffered an injury, called at her home. This, according to the wife's testimony, was early in January, 1938. The husband did not remember whether it was in January or the preceding month. They remained there about an hour and a half. Some time prior to this visit they had seen Miss Johnson at the Multnomah church, but the wife testified that she herself had not been at that church for more than two years. She thought that she had seen Miss Johnson on the street during the previous year, but was not sure.

These witnesses had not called at the McRell home often or regularly. The husband stated that he had not observed Miss Johnson closely, did not remember whether she spoke or not, saw nothing unusual in her appearance, and did not notice that she had lost any weight. All the time they were visiting there, according to the wife's testimony, Miss Johnson held a newspaper before herself, but the witness did not know whether she read it or turned the pages. The wife also stated that Miss Johnson answered her greeting when she entered the room and that she was "really surprised to see how well she was looking, both physically and mentally; . . . I would never have known there

was anything the matter with her mind if I hadn't been informed before by friends. I was much surprised to see how well she was looking. * * * I don't know whether her body was thinner or not, because she didn't get up and move; she just sat there all evening, or all the time we were there."

This witness further testified: "I went prepared to find her in a mental condition; I don't know how. Well, I had heard that she had a sickness that was affecting her mind." She was told in the fall of 1937 about Miss Johnson's mental condition, but did not remember exactly what time in the fall.

The remaining witness of those called by the proponents of the will, other than those immediately concerned with the signing of the will, and the expert witnesses, was a woman who had lived at Multnomah at different times during the five or six years immediately preceding the trial, the last two years continuously. During October, November and December, 1937, she stated, she saw Miss Johnson frequently. Asked what she had observed as to Miss Johnson's physical and mental condition, she answered: "I realized that Miss Johnson was much thinner than she had been previously, and she wasn't doing the active hard work that she did previously." When questioned specifically as to Miss Johnson's mental condition, her answer was: "That, I am not prepared to say; I thought that she had some kidney trouble; that was my impression, and we took care of her in that way." This witness also testified that some time subsequent to September 27, 1937, she talked with Miss Johnson about procuring some reading matter for her, and that when asked what she would like to read, Miss Johnson said, "Red Pepper Burns", which is the name of a novel written

by Grace S. Richmond. The witness stated that she obtained from the public library two other works of this author, gave one to Miss Johnson to read, and believed that Miss Johnson read the book.

Wayne Loomis, one of the two beneficiaries under the will and the nephew of the decedent, was 20 years old at the time of the trial. He had completed two years' work in college. As a witness, he attempted to make it appear that there was friction between the McRells and the Loomis family, although, he said, Mr. and Mrs. McRell had been good to him and his sister, "outwardly, if you want to make it an issue." He referred to the fact that his aunt, Miss Johnson, had expressed an intention to leave to him and his sister all she had upon her death. He testified that he began to notice Miss Johnson's physical weakness prior to the time that she went to the clinic, and stated that before she became ill she was as strong as an average man and did a man's work around the McRell-Johnson home. He stated that after she became ill the McRells treated her "like they would treat a child, and I saw no reason for it." In explaining this, he said: "Well, at the dinner table, there was hardly a time when,—if she made some mistake in eating, for instance, they would point it out to me very definitely and say, 'See how crazy your aunt is, Wayne.'"

Wayne further stated that the McRells did not allow Miss Johnson "to go outside at all, to get rid of any excess energy she may have had; she was watched and guarded all the time." After Miss Johnson returned from the clinic, he testified, "physically she seemed to grow much better until, oh, sometime in January, and then she began to get worse and became much weaker." He also stated that he never observed "any mental

change in her''. He had accompanied her to visit their relative near Eugene in September, 1937, and had heard her mental condition discussed by others then present.

He stated that he believed that Mr. and Mrs. McRell did not go to the beach, but were at home, on October 8, 1937, the day that Miss Johnson went to the attorney's office and signed the will.

Joyce Loomis, the other beneficiary, niece of the decedent, stated that Miss Johnson was normally a very stout woman and that her loss of weight became quite noticeable in the summer—July, 1937. The time that Miss Johnson went to the clinic was ''when she was getting so terribly thin''. According to Joyce's testimony, Miss Johnson's mind did not begin to fail until late in February, 1938. Up to that time the witness did not entertain any suspicion that her aunt was not right mentally. After Miss Johnson's return from the clinic and hospital she did no work around the McRell-Johnson home, Joyce stated. The witness saw Miss Johnson slapping herself or rubbing her legs, once or twice, and Miss Johnson explained her action by saying that ''it made her feel better because they were numb''. This witness stated that her mother did not at any time, even in late February, 1938, mention to her Miss Johnson's mental condition. Asked if anybody else had mentioned it to her, Joyce answered: ''Yes, many people have.'' She named Mr. and Mrs. McRell and two others as having spoken to her of her aunt's mental condition. When anybody mentioned that subject to her, she testified, she insisted that Miss Johnson was all right mentally.

Joyce also was of the opinion that Mr. and Mrs. McRell were not absent from home on the day that Miss Johnson went to the attorney's office and signed

the will, as she remembered that her aunt came down to the Loomis home the next morning, "and so I am sure the McRells were not away at that time, because she didn't stay alone at that house, and she didn't stay at our house that night."

At this point it is appropriate to review the circumstances attending Miss Johnson's signing the will. According to the testimony of Mr. and Mrs. McRell, Miss Johnson after returning from the hospital had become such a care that Mrs. McRell found it necessary to have a short rest, and as she and Mr. McRell wanted to go to their beach home in order to get a painter who lived close to it to come to Multnomah and paint their house, they decided to spend a short time at their beach cottage. They left home Friday morning, October 8, for the beach, to remain there until Sunday, October 10. Their departure was about ten or eleven o'clock Friday morning, and that afternoon Mrs. Loomis took Miss Johnson in her car to the office of her attorney in Portland.

On October 5 Mrs. Loomis had called on the attorney who had represented her professionally for some eight years, and had requested him to prepare the will. She did not tell him at that time that Miss Johnson had been ill or that her mind had been affected, nor did she disclose to him that Miss Johnson had another sister, Mrs. McRell, and that the latter and Mrs. Loomis were her only heirs at law.

On March 22, 1934, a judgment was entered against Mrs. Loomis and two others, a husband and wife, for approximately $1,700, with interest and costs of the action. In September of that same year judgment was entered against Mrs. Loomis and two other individuals as surety on an administrator's bond, for $7,083.89 and

costs, with interest from April 18, 1932. Apparently these judgments were still outstanding against Mrs. Loomis at the time the will was signed. She had already been before the court on supplemental proceedings as to property owned by her on which execution could be levied. She had also claimed a homestead exemption in her own residence. Mrs. Loomis deposited her money in a bank account in the name of her son, in order to prevent judgment creditors from seizing it. There is a possibility that if Miss Johnson had died intestate or had devised and bequeathed her property to her two sisters, Mrs. Loomis's share might have been greatly depleted by the claims of judgment creditors.

It was testified to by Mrs. Loomis and her two children that on October 8 Mr. and Mrs. McRell were both at home, but it is our opinion that the preponderance of the evidence shows that in this respect they were mistaken. Miss Johnson, when taken to the office of Mrs. Loomis's attorney, was clothed in a house dress, or, as the attorney said, in a "kitchen dress". She was also wearing old shoes. The reason assigned by Mrs. Loomis in her testimony for her sister's not being more presentable on that occasion was that Miss Johnson did not want the McRells to know that she was going to an attorney's office to execute a will.

According to the testimony of both Mrs. Loomis's attorney and the stenographer in his office, the attorney dictated the will on October 5, following Mrs. Loomis's call at his office, and it was then transcribed. After the attorney looked it over he handed it back to the stenographer and according to the latter's testimony, "told me to take it, put it in my desk" and have Miss Johnson "execute the will in the usual manner". The stenographer testified that Miss Johnson and Mrs.

Loomis came to the office together in the afternoon of October 8. When they arrived the attorney was occupied. Miss Johnson, according to this witness, "looked as though she might not have been feeling so well, but she wasn't sick at the time she was in our office," and she "was rather a thin woman, and I don't think she was ever very heavy from the looks of her. She was more or less an odd appearing woman."

Miss Johnson remained in the reception room for about half an hour. The stenographer gave the will to her and she moved her chair over to the stenographer's desk, read the will to her and, according to the stenographer's testimony, said "this was exactly what she wanted; everything she owned was to go to her niece and nephew." Questioned about Miss Johnson's apparent mental condition, this witness gave the following testimony:

"A. I had no reason whatever to consider the fact that her mental condition was not all right.

"Q. In other words, you didn't give the matter a thought at the time? A. Excepting that she was a normal person; if anything else had been wrong, I would have noticed it.

"Q. How much talking did she do there? A. Well, she came in and talked to me in a general manner, like any of our other clients would do. She talked to me, and we commented on the weather, what the weather had been, and so on and so forth. She had been out, and told me about being, I believe, in the garden, or something; mentioned—just a general line of conversation."

When the attorney was ready to see them, Miss Johnson and Mrs. Loomis went into his private office and remained there together until after the will was

signed. The attorney testified that when Miss Johnson came into his office he asked her her name and she stated what it was. He also testified in this connection as follows:

"She had it [the will] in her hands when she came in; so I asked her if she wanted to make her will. She said 'Yes.' And 'whom she wanted to give her property to', and I believe I took the will, as I recall it, out of her hands then, and read to her the portion in which it states that she was giving all she had to those two devisees and legatees. She said she wanted to give it to Hazel—to Hazel's children, as I recall her words now. Then I asked her what property she had that she was giving away, and called her attention to the fact that she was giving it all. She said that she had a farm in Illinois, some property at Multnomah, and some money and some mortgages; and then I called in the two witnesses . . . They have told what occurred after that."

The attorney further testified that he had told all that occurred, as far as he could remember, that his memory was not good, but that it had been refreshed by the testimony of the subscribing witnesses and "other things that have come out here". He stated that Mrs. Loomis did not mention the fact that Miss Johnson lived with Mrs. McRell, nor did he know that Miss Johnson had any sister other than Mrs. Loomis. He was not told that Miss Johnson had been ill or was suffering from a mental disorder. Asked if he was told how it happened that she was at his office in a house dress, he answered: "No; I noticed that, though." His further testimony in this respect was as follows:

"Q. Well, now, you said her dress was peculiar; what was there peculiar about this house dress, as differentiated from other house dresses? A. Well, I don't

know whether women dress up for me, but they don't often come up in their kitchen dresses.

    \*        \*        \*        \*        \*

"Q. Well, you are stating that it was a kitchen dress. A. Well, no, I wouldn't know that it was a kitchen dress; I don't know enough about dresses to know that, but I noticed that it was a very poor looking,—cheap looking dress, and it seemed to me it was gray, and I noticed her shoes as she walked in."

The attorney stated that his charge for drawing the will was entered in his books against Mrs. Loomis.

This attorney also testified that some time before Miss Johnson was committed to the state hospital in Salem, Mrs. Loomis advised him that she desired to oppose any such commitment, and he, on his own initiative, called the county clerk's office and asked to be notified of the institution of any insanity proceedings against Miss Johnson. He was unable to fix the date when he first called the clerk's office, but it was stipulated that the deputy clerk to whom he spoke would testify, if called as a witness, that this happened early in January, 1938.

The other witness who attested the will with the stenographer was a young attorney in the office of the attorney who drew the will. When he was called in as a subscribing witness he was asked by the attorney who drew the will, he stated, to act as a witness to "Mrs. Johnson's will". The decedent, whom he further mentioned as "Mrs." Johnson, appeared to him "to be a rather peculiar type of person, from her appearance." He testified that he asked her if she desired him to act as a witness to the will, and she answered, "Yes." He also stated: "I believe I asked her if she knew what was in the will, if she knew that this was her will,

and she wanted to make her will, and she replied, 'Yes.' '' He then asked her if she wanted him and the stenographer to act as witnesses to the will. All that Miss Johnson said when he questioned her was ''Yes'' or ''I do.'' He also stated that he believed that the attorney who drafted the will asked Miss Johnson ''one or two questions regarding the disposition of the property, because I recall the mention of the Loomis children. Now, just what that was, I wouldn't attempt to repeat it, but my recollection, I will qualify that by saying, is a little hazier on that than on the questions that I asked.''

Mrs. Loomis was the only other witness present at the time the will was signed by Miss Johnson. Both she and the stenographer testified that Miss Johnson entered the lawyer's office unassisted, sat down and later arose without the help of others. She stated that she introduced Miss Johnson to the attorney and, ''I sat down in a very comfortable chair and turned her all over to'' the attorney. ''I purposely gave no assistance.'' She further testified that after entering the attorney's office Miss Johnson ''read the will aloud to'' the attorney and told him that ''that was just what she wanted''. The attorney ''questioned her very thoroughly about her niece and nephew and why she wanted to give it [her property] to them''. Mrs. Loomis also stated that Miss Johnson told the attorney that she had been quite ill. On the way home from the attorney's office, Mrs. Loomis testified, Miss Johnson said to her: ''Now, we will not tell any one about this'', to which Mrs. Loomis assented.

Miss Johnson's mind was normal, Mrs. Loomis insisted, until the last of February. She even maintained that Miss Johnson was not insane on February 23,

1938, when Mrs. Loomis and Mrs. McRell signed and swore to the notice of insanity in which it was alleged that Miss Johnson was an insane person "and by reason of such insanity is unsafe to be at large".

We shall not dwell at any great length on Mrs. Loomis's testimony, for the reason that her answers in many instances were very evasive and in important matters she was contradicted by her own witnesses. Her interest in the outcome of the litigation was manifested throughout the trial. Also, she admitted that when important matters were presented to her by Mrs. McRell she intentionally avoided giving direct answers, and in addition she concealed from her sister the execution of the will until after it was filed for probate, because, she explained, she "thought that Mrs. McRell knew" that Miss Johnson "had a will" leaving her property to the Loomis children. She further said: "I had heard Mr. and Mrs. McRell say also that they were going to leave everything they had to the children. I had heard them say it many times."

Dr. William Lidbeck, who was connected with the medical staff of the state hospital in Salem, testified that he had performed an autopsy on the body of Miss Johnson, and described his findings. He stated that she died of chronic encephalitis, and that she did not die of cerebral hemorrhage. He did not attempt to give an opinion as to her mental capacity to execute the will in question.

Dr. J. Raaf, who has made a specialty of diseases of the brain and spinal cord, was called as an expert witness on behalf of the proponents of the will. In answer to a written hypothetical question submitted to him by the proponents, based upon a part only of

the autopsy report, he said: "I would say, as I understand the statement as written there, that there was no involvement of the left side of the brain; it seems to me that the involvement was on the right side. I believe that the right side could be involved without affecting the mentality, because we know that the frontal lobe, which governs the thinking of the patient, can be removed on one side, and still the patient be perfectly normal, so far as his mentality is concerned; so, in my opinion, one frontal lobe could be involved rather extensively, and yet the mentality of the patient not be affected." On cross-examination the attention of this witness was directed to the full report made by Dr. Lidbeck, and he was asked what would have been his answer to the hypothetical question, if it had included the entire report of Dr. Lidbeck, rather than a part only. He thus testified:

"My statement then would have been that I could not tell regarding what the mental condition of the patient would be.

"Q. I see. So that if the full statement, not only what was read to you by counsel, but what I now read to you, was asked, you would say you would be unable to state what the mental condition was? A. That's correct."

Dr. Robert P. Smith was called as the court's witness. On examination by counsel for the contestant this witness stated that he was a specialist in nervous and mental diseases, a psychiatrist. He was asked a hypothetical question based on the facts in the case as understood by the contestant, which question comprised some six pages of the transcript. He was required to say whether or not, assuming the facts therein contained to be true, Miss Johnson on October 8, 1937, had the

mental capacity to execute a will. He thus replied: "The hypothetical woman submitted to me was, in my opinion, evidently, dating from Labor Day, as the question asks, totally incapacitated for making a will, due to mental deterioration and dilapidation." He further stated that the hypothetical woman "would follow the line of least resistance and do as she was instructed to do, as a child would do." Other testimony of this witness was as follows:

"Q. Assume that such a woman was taken by a sister to a lawyer's office and there presented with a will already prepared, and requested by that sister to sign the same, would you say, in your opinion, that she would probably sign it without understanding? A. I don't think there is any question about it."

After asking Dr. Smith a number of questions, the proponents submitted to him a hypothetical question based upon the findings of the doctor who performed the autopsy, inquiring if he would "conclude from that that both sides of the brain were affected with the softening". His answer was: "I would. The only difference is the difference in degree on the left side, . . . but it states specifically that the whole brain, more or less, is softened."

The testimony of most of the contestant's witnesses is covered by the general summary, and we have not attempted to discuss it in detail as we have that of the proponents' witnesses. To do so would unnecessarily extend this opinion and encumber the reports with unpleasant and even distressing reading. Reference will briefly be made, however, to part of the testimony of two of the witnesses called by the contestant.

One of them was a woman who at the time of the trial had been living four years at Gladstone. For 10

years prior thereto she had lived at Multnomah and was, she stated, a friend of the McRells, Miss Johnson and Mrs. Loomis. In the early part of October, 1937, she testified, she stopped at the McRell-Johnson home to see Miss Johnson and there found Mrs. Loomis outside the house. Mrs. Loomis told her "that the folks are at the beach" and asked her if she wanted to see Miss Johnson. When the witness replied in the affirmative, she and Mrs. Loomis went to the latter's home. The door was locked and Mrs. Loomis explained that by saying, "Why, we kind—we kind of have to watch Pearl; . . . The other day she wandered away down in the pasture—in the orchard." This witness found Miss Johnson in a back bedroom of the Loomis home, wearing a coat and hat. The witness asked her how she was, and Miss Johnson said, "Fine."

Dr. W. G. Keller, an osteopathic physician, was called upon to give Miss Johnson treatments beginning September 27, 1937. Prior to that time he had rendered professional services to Mrs. McRell and Mrs. Loomis, and he had known both families for many years. He had also treated Miss Johnson prior to the date mentioned. Beginning September 27, he treated her twice a week until late in December. When she came to his office for treatment, he testified, she was sometimes brought by Mrs. McRell and at other times by Mrs. Loomis. Asked what he treated Miss Johnson for, Dr. Keller stated: "Well, she was unable to take care of herself; being of a very—a self-possessed woman, a woman who was able to carry out what— the usual duties on a small farm, you might say: she fed the chickens and milked the cow and gathered the

apples and made garden; and at the time she was brought to me, she was more on the order of a helpless child." He said also that her speech was incoherent and rambling; that her fingers were constantly moving, most of the time stroking and patting herself; and that she had a blank facial expression. He further stated that her condition, from the time she was brought to him until December, 1937, was progressively becoming worse. The witness was then asked: "What would you say, Doctor, as to her docility, her willingness to agree with what any one said? In other words, her amenability to suggestion?" He thus answered: "Well, that seemed to be one of the failing points with her, that she was always willing to take to the suggestion of the other fellow; she didn't have any mentality or mind of her own."

■ Section 10-501, Oregon Code 1930, provides that every person of certain age or upward, "of sound mind, may by last will, devise and bequeath all of his or her estate, real and personal". In determining what is meant by "sound mind", this court in *Estate of Allen*, 116 Or. 467, 471, 241 P. 996, stated that the term "sound mind" as used in the statute is synonymous with "sane mind". The opinion therein quotes with approval from 32 C. J. 621, as follows:

"The terms 'unsound mind' or 'of unsound mind' are generally held to include every phase of unsound mind rendering one incapable of caring for himself or his property; every species of unsoundness of mind. These terms are of such variable significance that their value in any given case will depend entirely upon the relation that they bear to a particular person in connection with a particular act under inquiry."

■ The test of capacity to make a will is set forth by this court in the following language in the case of *In re Phillips' Will,* 107 Or. 612, 213 P. 627:

"The law of this state, as announced by the rule adduced from the following decisions, is that if, from all the facts and circumstances taken together, it satisfactorily appears that the testator, at the time of making his will, comprehends the nature of the act in which he is then engaged, knows the nature and extent of the property which makes up his estate and which he intends to dispose of, and has in mind the persons who are, should or might be, the objects of his bounty, and the scope and reach of the provisions of the written instrument, he has sufficient capacity to make a will."

See, also, *Estate of Allen,* supra, and *Copenhefer v. Powers,* 137 Or. 145, 149, 300 P. 505.

■ In *Estate of Riggs,* 120 Or. 38, 48, 241 P. 70, 250 P. 753, it is said:

"No particular degree of acumen will serve as the standard for testamentary capacity. Every case is to be decided upon its own facts and circumstances. The question is: Was the will the free and independent product of the testator's mind or not?"

■■ The trial court found that the decedent did not have testamentary capacity to execute the will here in question, and we concur in that finding. The overwhelming weight of testimony is to the effect that Miss Johnson, at the time the will was signed, was not of sound mind and did not comprehend the nature of the act in which she was engaged in so signing; and that she would comply with any suggestion or request made to or of her, except as those might conflict with her obsession regarding the performance of a duty or responsibility, such as her former household tasks. The

burden of proof was upon the proponents to establish testamentary capacity of the decedent: *Copenhefer v. Powers,* supra.

We have not overlooked the testimony of the subscribing witnesses to the will. The testimony of the young attorney who acted as one of the witnesses does not throw much light on the subject. The stenographer who was the other witness was too ready and anxious to say things that she thought would be helpful to the case of her employer's client. At the close of the case, when she was recalled as a witness, she narrated that Miss Johnson "walked into our office absolutely unassisted, took a chair, which was several feet away from my desk, sat down absolutely unassisted, and after she sat there for a few minutes and talked to me in a general way, she got up and picked up her chair,— it was a sturdy oak office chair,—and took it clear across the office to my desk, and sat there and talked to me again, . . . and everything that she done in our office, she done by herself, unassisted." When asked what the mental condition of the testatrix was, the stenographer offered this opinion: "Well, she was of sound and disposing mind and knew what she was doing at all times, and wanted her estate to go as the will stated."

The record does not disclose that the attorney who drew the will knew whether the testatrix had been married or not, whether she had children or who her relatives were. The fact that Mrs. Loomis had gone to the attorney's office previously, had the will drawn, accompanied Miss Johnson and remained in the attorney's private office all the time that Miss Johnson was there, should be kept in mind in weighing the testimony of the subscribing witnesses.

"Enfeebled mentality, secrecy and self-interest", it is said in *King v. Tonsing,* 87 Or. 236, 170 P. 319, "are three dangerous guests to be present together at the making of a will, and they were all there when this will was executed." No less can be said of the circumstances surrounding the execution of the will now before us.

■ This court in the *Faling Will* case, 105 Or. 365, 446, 208 P. 715, with reference to a marked change of habits and actions as evidence of lack of testamentary capacity, observed:

"Whether Mrs. Faling was competent to execute a valid will on August 26, 1915, can best be determined by a comparison of herself at that time with herself in former years as she was known by those who had opportunities to observe and measure her mental qualifications. A marked change in a person's habits and thoughts is evidence of mental unsoundness. Insanity is indicated by proof of acts, declarations and conduct inconsistent with the character and previous habits of the person: Knapp v. St. Louis Trust Co., 199 Mo. 640, 98 S. W. 70, 78."

Further on in that opinion, after stating that it was competent for the subscribing witness to a will to give his opinion of the sanity of the testatrix, it is said:

"If the witnesses are intimate acquaintances of the testatrix they could properly express their opinion as to her sanity and give their reasons for it; but it is for the court to ultimately decide whether Mrs. Faling at the time had sufficient mental capacity to execute a will."

The facts relating to the will there under consideration are contrasted by the court with the facts in the case of *In re Sturtevant's Estate,* 92 Or. 269, 178 P.

192, 180 P. 595, and it is pointed out that in the latter instance the attorney who drew the will, before having it executed by the testator "called in a physician who thoroughly examined Sturtevant for about an hour and testified he was of sound mind."

The proponents in their reply brief urge for the first time that an attack upon a will on the ground of undue influence admits testamentary capacity of the testator at the time the will was made. In support of this proposition they quote the following excerpts from *Estate of Riggs,* supra, which is derived from 28 R. C. L., Wills, § 92, page 139:

"An attack on a will on the ground of undue influence concedes the existence of testamentary capacity; and when a person wholly lacks testamentary capacity there is no room for the operation of fraud or undue influence in the execution of his will. Yet the undue influence which will invalidate a will depends to a very considerable extent on the intellectual capacity and firmness or the facility of disposition of the testator. Obviously, it requires much less influence to control the will of a person of weak mind and infirm purpose than one of vigorous intellect and determined character."

In the contest involved in *Estate of Riggs,* supra, the will was attacked on the grounds both of lack of testamentary capacity and undue influence. After quoting the above excerpt and without making any application of it to the facts therein, the court proceeded to discuss both theories of the contestants' case, and did not hold that the charge of undue influence admitted testamentary capacity of the testator.

In the case of *In re Murphy's Estate,* 43 Mont. 353, 116 P. 1004, Ann. Cas. 1912 C, 380, cited in 28 R. C. L. in a footnote relating to the excerpt above quoted, the court

decided that the judgment of the trial court should be upheld if the evidence supported either ground assigned by the contestants for avoiding the will.

It is said in *Burney v. Torrey,* 100 Ala. 157, 14 S. 685, 46 Am. St. Rep. 33, also cited in the above-mentioned footnote, that: "Sufficient capacity, free agency, without the imposition of fraud or deceit, are the elements of a valid will."

■■ This court has never directly held that an attack on a will on the ground of undue influence concedes the existence of testamentary capacity. In any event, it is too late to raise that question at this stage of the proceeding.

Inasmuch as we are of the opinion that the will was void because the decedent did not have testamentary capacity, the question of undue influence is of no importance.

The decree of the circuit court is affirmed.

RAND, C. J., and BELT and LUSK, JJ., concur.